## Lenihan v. Commonwealth.

(Decided May 27, 1915.)

### Appeal from Jefferson Circuit Court (Common Pleas Branch, First Division).

1. Attorney and Client—Disbarment.—An attorney who endeavors to instigate the bringing of a suit for damages after he has learned that the matter is in process of settlement, and who takes the injured party, a minor, to his office for the purpose of having a guardian appointed, without getting the consent of the boy's parents, and who falsely represents to the boy that his parents could not act as guardian, is guilty of such unprofessional conduct as to warrant his suspension or disbarment.

2. Attorney and Client—Disbarment—Power of Judge to Issue Information on His Own Motion.—It is not only the right but the duty of a judge of the circuit court, when he learns from facts within his knowledge or from information conveyed to him by the county or Commonwealth's attorney, or a committee of lawyers, or some person aggrieved, that an attorney has been guilty of grossly unprofessional conduct, to institute proceedings for his suspension or disbarment, and the judge may initiate the proceedings on his motion.

3. Attorney and Client—Disbarment.—Courts, independent of statute, have the inherent right to control and regulate the official conduct of court officers and to inflict upon them punishment for official misconduct; and a court has jurisdiction without any formal complaint or petition, upon its own motion, to strike the name of an attorney from the roll, provided he has had reasonable notice and opportunity to be heard in his defense.

4. Attorney and Client—Disbarment—Practice—Jury Trial.—The proper practice in disbarment proceedings is to issue an information setting forth the nature of the charges against the attorney and give him an opportunity to be heard in his defense. The court may generally dispose of the matter without the assistance of a jury, but where there are disputed questions of fact, a jury may be impaneled to pass on these questions.

5. Attorney and Client—Disbarment—Evidence of Good Character of Accused May Be Introduced.—Where an attorney is proceeded against by charges directly involving his probity, honesty and good moral character, he may offer evidence in support of his character, although it has not been attacked by witnesses for the prosecution.

6. Attorney and Client—Disbarment—Punishment.—It is a generally accepted principle that since the primary purpose of disbarment proceedings is the protection of the court and the public, permanent disbarment should never be decreed if any discipline less severe would accomplish the desired result.

WM. A. PERRY and A. J. BIZOT for appellant.

A. SCOTT BULLITT, ELMER C. UNDERWOOD and HUGH B. FLEECE for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

This is a disbarment proceeding instituted by Judge William H. Field, one of the judges of the Jefferson Circuit Court, against the appellant, Joseph Lenihan, an attorney-at-law. Upon a trial of the case, Lenihan was found guilty, and it was adjudged "that the right, license and authority of the defendant, Joseph Lenihan, to practice as attorney or counsellor-at-law in any of the courts of the Commonwealth of Kentucky, be and the same is hereby revoked and said defendant is now hereby forever disbarred as an attorney or counsellor-at-law in the Commonwealth of Kentucky."

On this appeal by Lenihan from the judgment of disbarment a reversal is asked upon several grounds that will be later noticed; but, before taking them up, the information, accompanying affidavits, and the effect of the evidence heard on the trial, will be set forth, so that the nature of the accusation and the errors assigned for reversal may be well understood.

The information recited that "The Commonwealth of Kentucky, upon information contained in the affidavits of Herbert Semar, Chris Semar, and Mrs. Semar, charges:

"That Joseph Lenihan is and was at the times herein mentioned an attorney-at-law, practicing at the bar of the Jefferson Circuit Court; that Herbert Semar, an infant seventeen years of age, sustained certain injuries on Monday, September 21, 1914, through the falling of some glass from a front window of the establishment of Alex. Hirshberg, at 619 West Market street; that on Tuesday, September 22, 1914, defendant, Joseph Lenihan, visited the home of Herbert Semar and endeavored to secure either for himself or others employment to make a claim or bring suit for Herbert Semar; that the mother of Herbert, Mrs. Semar, declined to employ him and declined to take any action without the knowledge and consent of her husband; that defendant, Lenihan, asked that Herbert Semar be allowed to guide him to the place of employment of the husband, Chris Semar, which Mrs. Semar allowed; that Herbert entered the automobile of defendant and guided him to his father's place of employment, the Peaslee-Gaulbert Warehouse, Fifteenth and Lytle streets; that defendant, Lenihan, asked Chris Semar to allow him to take his son, Her-

bert, before Hon. Samuel Greene, Judge of the Jefferson County Court, that his injured hand might be examined, to which Chris Semar consented; that Herbert Semar was thereupon taken by defendant, Lenihan, to an office in the Inter-Southern Building, where he was told that it would be necessary to have a guardian appointed for him; when asked whom he desired appointed, he answered that he wanted either his father or his mother named, whereupon he was told by defendant, Lenihan, and a Mr. Greene, who was present, that such an appointment could not be made and that his guardian must be a court official; that he was then instructed that when taken before Judge Greene and asked by him as to whom he desired appointed he should name Mr. Page; that he was taken before Judge Greene, followed the aforesaid instructions, and Robert L. Page was appointed his guardian; that said appointment was secured by defendant, Lenihan, without the knowledge and consent of the parents, or either of them, of Herbert Semar, and against the wishes of Herbert Semar himself, and against the wishes of his parents; that defendant, Lenihan, knew that none of the parties desired to prosecute a claim against Alex. Hirshberg, having been told that the matter was in process of amicable adjustment, and having also been told that if any attorney were needed the parents of Herbert Semar would place the matter in the hands of a certain one whom they knew; that all of the aforesaid acts of defendant, Lenihan, were contrary to his oath and obligations as an attorney of the Jefferson Circuit Court, and against the peace and dignity of the Commonwealth of Kentucky.

"The affidavits of Herbert Semar, Chris Semar, and Mrs. Semar are filed herewith as part hereof. (Sgd.) Wm. H. Field, Judge."

The affidavit of Herbert Semar was as follows: "The affiant, Herbert Semar, states that he is 17 years of age and lives with his parents at 2208 Lytle street, Louisville, Ky.; that on September 21, 1914, he left home to look for work; that at about 10:30 o'clock in the morning he was passing No. 615 W. Market street, the establishment of Alex. Hirshberg, when some glass fell from the front of the building, striking him upon the right hand and injuring him; that on Tuesday, September 22, 1914, at about 9:00 o'clock in the morning, Joseph Lenihan came to his home and endeavored to persuade his mother

to allow him to enter suit; that his mother declined to do anything without the knowledge and consent of her husband, Chris Semar; that with the understanding that affiant was to show said Lenihan where his father was employed, he entered the automobile of said Lenihan and accompanied him to the Peaslee-Gaulbert Warehouse at Fifteenth and Lytle streets; that he heard said Lenihan ask his father if he could take affiant up to let Judge Greene see his hand and talk the matter over with him; that his father consented to this, and he accompanied Lenihan to an office on the fourteenth floor of the Inter-Southern Building; that affiant was told that a guardian would have to be appointed for him, and was asked whom he desired; whereupon he said he desired that his father or mother be named; that both Mr. Lenihan and Mr. Greene told him neither could be appointed, and that his guardian would have to be a court official; that he was then instructed that when taken before Judge Greene and asked by him whom he wanted as guardian he should say that he desired Mr. Page; that he was then taken before Judge Greene by Mr. Greene, and that he followed instructions, and he is advised that Mr. Page was appointed; that affiant did not want any one appointed guardian, but if any one was appointed, he preferred his father or mother."

The affidavit of Chris Semar was as follows:

"Affiant says that J. L. Lenihan, an attorney, called to see this affiant on the 22nd day of September, 1914, at the Peaslee-Gaulbert Co. place of business, and that the said Lenihan told affiant he wanted to take his boy to see Judge Samuel Greene to have a talk with him, and that he had seen the piece of glass fall on the boy's hand, had witnesses to this fact; that Lenihan also told this affiant that his partner, L. D. Greene, was a brother of Judge Greene, the county judge.

"Affiant says that Lenihan did not tell or say anything about having a guardian appointed; affiant says that he told Lenihan it would be all right for him to take the boy to see Judge Greene."

And the affidavit of Mrs. Semar was in the following words: "Affiant, Susie Semar, says she is the wife of Chris Semar and the mother of Herbert Semar. Affiant says that on the 22nd day of September, 1914, J. L. Lenihan, an attorney, called at this affiant's home, 2208 Lytle street, and asked her to let him take up the claim against

Alex. Hirshberg for her son, Herbert Semar; that he had several witnesses to the accident, and wanted her to let the boy go with him to see Mr. Semar; affiant told Lenihan that Mr. Houston Quin was her attorney if she needed an attorney. Affiant says that she consented for Herbert to go with Lenihan to show him (Lenihan) the place where Mr. Semar was employed. Affiant says that Lenihan did not tell or say anything about having a guardian appointed for the boy.''

Lenihan, for response to the rule, after a general denial, said that while passing in an automobile the place where the accident happened, he learned the boy's name and where he lived, and on the following day, having occasion to go in the neighborhood of the boy's home for the purpose of looking at some property in which he was interested, he paid a visit to the boy, whom he found there in company with his mother. That during the conversation which ensued with the mother and the boy, he found that, although they were not satisfied with the way in which Hirshberg was acting, they seemed unwilling to take any action against him without consulting the father. That after talking further, Herbert and the respondent visited the father at the place where he was working, and in the course of a talk with him, he expressed the fear that the boy might be badly injured and that something ought to be done; and then respondent offered to take the boy to the office of L. D. Greene for the purpose of taking such steps as might be necessary to protect the rights of the boy. That he told the father if any action was taken or settlement made, it would be necessary to have a guardian appointed, and that as the boy was over fourteen he had the right to select his own guardian; that the father expressed himself as being entirely satisfied that the matter should be left in the hands of Mr. Greene and made no objection to the appointment of a guardian; that thereupon respondent accompanied the boy to the office of Mr. Greene and stated to Greene that the boy had been injured and desired to consult him about his case; that he may have suggested that R. L. Page, the public guardian, be appointed as guardian, but that he did not recollect distinctly about this, and soon after he left the boy in the office with Mr. Greene.

He further said that ''at no time did he try to deceive either the father, the mother or the boy as to their

· rights in the matter, nor did he conceal anything from them, but frankly and fully informed them as to the boy's legal rights, and would have been satisfied if the boy had selected either parent to act for him, but that neither expressed such a wish in his presence. That the appointment of said guardian was made voluntarily on the boy's own motion, and this defendant was not present in the county court room at said time, nor did he have anything to do with the selection of said guardian and did not know whom the boy had selected until several days later. That Herbert did not ask that he be allowed to name either of his parents as guardians, nor was he told by any one that he could not have his parents act, or that a court official had to be appointed.'' He further said that ''he had made no contract of employment with said guardian; that he brought no suit, nor did he do anything that was contrary to the statute or in violation of the ethics of the legal profession.''

On the trial of the case, Judge Field empaneled a jury to hear and determine the issues of fact, and upon the trial the evidence for the Commonwealth was, in substance, a recital of the facts set forth in the affidavits of the Semars, except that it did not appear from this evidence that Lenihan made any suggestion or request that Herbert be taken before Judge Greene so that his ''injured hand might be treated;'' while the evidence for Lenihan supported the statements contained in his response.

It will be observed that the substance of the charge contained in the information is that Lenihan was guilty of grossly unprofessional conduct: (a) in endeavoring to instigate the bringing of a suit for damages after he learned that the matter was in process of settlement; (b) in taking the boy to his office for the purpose of having a guardian appointed so that a suit might be brought in which he would be employed, without getting the consent of the boy's parents or informing them that he contemplated having a guardian appointed; (c) in falsely representing to the boy that neither of his parents could act as guardian for him and that it would be necessary to have some court official appointed, although the boy wanted one of his parents to act as guardian if a guardian was appointed.

On this appeal it is urged that the information did not state facts sufficient to constitute an offense for

which the respondent could be disbarred, and therefore the demurrer to the information filed in the lower court should have been sustained.

In considering this question it may be well to here state that we have no statute regulating the subject of the disbarment of attorneys or the practice in such proceedings, except that Section 97 of the Kentucky Statutes provides that "no person convicted of treason or felony shall be· permitted to practice in any court as counsel or attorney-at-law," and Section 104 providing that if an attorney collects the money of his client and on demand fails or refuses to pay over the same, he may be suspended from practice for twelve months, or until the money shall be paid. But the absence of a statute describing the causes for which an attorney may be disbarred does not prevent disbarment proceedings from being instituted or attorneys from being disbarred when they have been guilty of any personal or professional misconduct that shows them to be lacking in honesty, probity, and good demeanor, or unworthy to continue as officers of the court, charged with the duty of aiding in the correct administration of the law.

In Baker v. Com., 10 Bush, 592, this court said: "If the evidence of such a moral character must be produced in order to obtain the license, it is equally as essential that this character should be retained; and when an attorney commits an act, whether in the discharge of his duties as attorney or not, showing such a want of personal or professional honesty as renders him unworthy of public confidence, it is not only the province but the duty of the court, upon a proper and legitimate presentation of the case, to strike his name from the roll of attorneys. Nor is it necessary, as contended by appellant's counsel, that the offense should be of such a nature as would subject him to an indictment. He has by his own misconduct divested himself of qualifications that were indispensable to the practice of his profession; and while he may regard the judgment depriving him of that right as a punishment for the offense, the action of the court is based alone upon the ground of public policy and for the public good."

Again, in Nelson v. Com., 128 Ky., 779, we said: "To be admitted to the bar a person must not only be learned in the law, but possess a character for honesty, probity, and good demeanor. A certificate of such

character, furnished by the county court of his residence, is a prerequisite to the granting of the license. It is the possession of the character described that entitled him to admission to the bar, allowing that he is able to pass the requisite examination touching his learning. The continued possession of character is as essential to maintain his relation as an attorney-at-law as it is to have it in the first instance to be admitted. The office is one peculiarly of confidence. Not only do his clients repose trust in his integrity, but, as an officer of the court in the matter of administering justice, his privileges and duties are such as to constantly call for the exercise of fidelity, both to his client and to the State. A lawyer without good character is not only a reproach to his profession, but he brings it into public distrust and is a very menace to the administration of justice itself. All courts have as an incident to the power to admit attorneys to the bar the power to disbar them for such conduct as shows they are not longer worthy of confidence. It is not necessary that the misconduct should be such as would render him liable to criminal prosecution. If it shows that he is unfit to discharge the duties of his office, is unworthy of confidence, even though the conduct is outside of his professional dealings, it is sufficient. If he is not honest, if he is not moral, if he is not of good demeanor, he may be disbarred, and should be.''

Also, in Com. v. Roe, 129 Ky., 650, this may be found: ''Section 97 of the Kentucky Statutes of 1903 provides that 'No person convicted of treason or felony shall be permitted to practice in any court as counsel or attorney-at-law.' But this does not mean that only those who have been convicted of felony or treason may be disbarred. It would be doing a serious injustice to the intelligence of the law-making department of the State to hold that such was their intention, or to conclude that, by the enactment of this statute, they meant to declare that, however flagrant the misconduct of an attorney, if it was less than a felony, the courts were powerless to protect themselves, the profession, and the public. The statute points out two of the causes that peremptorily warrant disbarment proceedings, but it does not, and was not designed to, limit the right to the causes mentioned. An attorney may be guilty of many offenses, evidencing a want of honesty, probity, and good

moral character, that would authorize the court to disbar him independent of the statute.''

Therefore, the question raised by the demurrer resolves itself into the inquiry whether the charges contained in the information, if true, amounted to such misconduct on the part of the respondent as showed him to be wanting in honesty, probity, and good demeanor in his professional capacity. He did the things charged in his capacity as an attorney and not as an individual, and so what he did is to be measured by the standards of honesty, probity, and good demeanor prevailing in a profession that endeavors to maintain among its members high standards of respectability and honor. The demurrer, of course, admitted the truth of the charges, and, therefore, in disposing of this question, we must assume that the respondent was guilty of the acts set forth in the information.

Assuming, then, the truth of the information, we think it cannot be seriously questioned that an attorney who, for the purpose of securing employment in or compensation out of a contemplated law suit, resorts to false statements and fraudulent practices, is guilty of professional misconduct of such a nature as to merit and deserve either suspension for a period or permanent disbarment depending on the facts and circumstances surrounding the transaction. If this method of securing business should be tolerated or be allowed to go unpunished, there is scarcely any corrupt or dishonest thing that an attorney in the pursuit of employment might not do.

It is generally known that there are lawyers who solicit employment in cases in which they would not otherwise be engaged, and this conduct on the part of a few has subjected the profession as a body to no little reproach and the lawyers engaged in this practice to much deserved censure. But the unprofessional effort to obtain business by mere volunteer solicitation is of small consequence as compared with the effort to secure employment or obtain business by false representations and deceitful methods. If a person who has a cause of action or grounds upon which a suit might be maintained, wishes to settle the matter amicably, an attorney cannot with propriety endeavor to prevent this peaceful adjustment, and, of course, an attorney should not be allowed to escape punishment if, for the purpose of incit-

ing litigation and to accomplish this end, he resorts to false statements or deceitful practices. And if the respondent committed the acts charged in the information, he was clearly guilty of such unprofessional conduct as would justify at least his suspension for such a period of time as might be sufficient to teach him the lesson that an attorney must not indulge in practices that will bring discredit on the profession.

Another ground of reversal earnestly pressed on our attention is that the information should have been dismissed on motion, because Judge Field did not have authority to institute the proceeding. The information, as we have seen, was issued by Judge Field upon the credit and strength of the affidavits heretofore noticed, and we think that Judge Field had ample jurisdiction and power to issue the information.

The respondent Lenihan having been admitted to practice law in the Jefferson Circuit Court, a branch of which was presided over by Judge Field, he was an officer of the Jefferson Circuit Court, and consequently of all the branches of that court. In other words, the situation was precisely the same as if there had been only one circuit court in Jefferson County, and that court had been presided over by Judge Field.

The practice regulating disbarment proceedings is not, as we have noted, regulated by statute, but all courts of general jurisdiction have at all times in the history of the law possessed the inherent power to suspend and disbar attorneys for professional misconduct of such a character as showed them to be unworthy to hold the place of officers of the court; and the books are full of cases in which the court, on its own motion, has instituted proceedings like this. Indeed, we think that it is not only the right, but the duty, of a judge of a circuit court to institute, upon his own motion, proper proceedings for the suspension or disbarment of an attorney, when, from information laid before him, or from his personal knowledge, it appears to his satisfaction that the attorney is so demeaning himself as to be unworthy to continue as an officer of the court.

The circuit judges in this State are, excepting the judges of the Court of Appeals, the highest judicial officers in the State, and the circuit court is a court of general, common law, criminal and chancery jurisdiction, second in importance in its powers and function

only to the Court of Appeals of the State. Clothed with large authority and possessing, as they do and should, the confidence and respect of the people, the judges of these courts, for the protection of the general public and to promote the purity of the administration of the law, may and should take appropriate action against any attorney who so conducts himself as to show that he is wanting in the proper measure of respect for the court of which he is an officer, or is lacking in the good character essential to continuance as an attorney.

This action may be taken by the court on its own motion, or it may be taken by the court on motion of the county or Commonwealth's attorney, or upon the motion of a committee of attorneys, or a bar association, or upon the motion of some person who has been aggrieved by the conduct of the attorney. The proceeding may be initiated in any of these ways. But, however it may be initiated, the question whether any action shall be taken lies with the judge of the court, because he must determine from the facts before him whether or not the proceedings shall be instituted. So that the information against an attorney to show cause why he should not be suspended or disbarred is, in its final aspect, the action of the judge of the court in which the proceeding is instituted or before whom the motion is made.

In Rice v. Com., 18 B. Mon., 472, which was a disbarment proceeding, this court, in answering an objection that the judge of the circuit court did not have authority to institute, on his own motion, the proceeding, said: "This objection is founded on a misconception, as well of the power as of the duty of the court. The defendant in the rule was an attorney-at-law, and an officer of the court. All courts have the power to control and regulate, to a certain extent, the conduct of their officers, and to inflict on them, for their official misconduct, such punishment as the law prescribes. If a court have knowledge of the existence of such official misconduct on the part of any of its officers, it not only has the power, but it is its duty, to institute an appropriate proceeding against the offender, and to bring him, if guilty, to condign punishment. And it is much to be regretted that this duty, which the law devolves upon the courts of the country, is so little regarded, and that the obli-

gations which it imposes are so frequently overlooked or neglected."

In Walker v. Com., 8 Bush, 86, it was again said: "It is a well-established rule of the common law that courts may inquire into the conduct of their officers, such as attorneys and counsellors who practice in their courts, and punish for offenses."

And so, in Com. v. Roe, 129 Ky., 650, we said: "Courts, independent of statutes, have at all times possessed the inherent right to control and regulate the official conduct of their officers, and to inflict upon them punishment for official misconduct. Attorneys-at-law are officers of the court, and it has always been the rule in this State that, when the attention of the court in which they practice was called to acts of professional misconduct, it had the right to disbar them if the facts of the case justified the infliction of this punishment."

In Ex Parte Wall, 107 U. S., 265, 27 L. Ed., 552, the Supreme Court, quoting with approval from an opinion by Chief Justice Sharswood, said: "We entertain no doubt that a court has jurisdiction without any formal complaint or petition, upon its own motion, to strike the name of an attorney from the roll in a proper case, provided he has had reasonable notice, and been afforded an opportunity to be heard in his defense."

On the trial of the case the court permitted the counsel representing the Commonwealth, who stated the case to the jury, to read to the jury the affidavits of the Semars upon which the information was based. This, we think, was error, and, in view of what will be later stated, prejudicial error. It was, of course, proper that the attorney for the Commonwealth should read to the jury the information, so that they might be advised of the nature of the accusation; but it was improper to permit him to read the *ex parte* affidavits upon which the information was based. The jury, of course, should determine the issues only upon the evidence heard by them in the course of the trial, from witnesses introduced by the parties and open to cross-examination, but the affidavits of the Semars, as will later appear, contained facts prejudicial to the respondent that were not developed in the evidence, and that the jury would not have known except for the fact that these affidavits were read in their presence and hearing.

It appears that when the evidence was in the court submitted to the jury five questions. The first one read: "Did the defendant, Lenihan, when he obtained the consent of the father of Herbert Semar to take said Herbert Semar up town, represent to said father that he was taking the said boy up town for the purpose of taking him before the Hon. Sam Greene, Judge of the Jefferson County Court, that the boy's injured hand might be examined?" The second one submitted the question whether Lenihan informed Chris Semar that he was taking the boy to his office for the purpose of having a guardian appointed. The third one, the question whether Semar consented to whatever course Lenihan or L. D. Greene might see proper to follow. The fourth one, the question whether the boy indicated to Lenihan or Greene a desire to have his mother or father act as guardian; and the fifth one, whether Greene or Lenihan told the boy that his parents could not be appointed as guardian and that he must have a court official. The jury answered in the affirmative questions one, four and five, and in the negative questions two and three.

It will be observed that the first question directed the attention of the jury to representations made by Lenihan that he wanted to take the boy before the judge of the county court so that "his injured hand might be examined." The objection to this question is that there was no evidence upon which to rest it, except statements contained in the *ex parte* affidavits before mentioned. Interrogatories such as these should be directed and confined to evidence heard on the trial of the case, and as there was no evidence of this character, it is apparent that the jury were enabled to answer this question in the affirmative from the statements made in the affidavits read to them, and which they doubtless concluded they had the right to consider in making up their minds.

Another and more serious question is presented in the refusal of the trial judge to permit the respondent to introduce evidence of his good character. The disposition of this question has given us no little trouble, but, after giving to it careful consideration, we have reached the conclusion that in disbarment proceedings for causes such as those here appearing, the respondent should be permitted to show his previous good reputation for honesty, probity, and good moral character, not to justify or excuse the offense, but to support his evidence

that he did not do or say the things charged, and to mitigate the gravity and consequences of the offense.

It is true that the authorities are usually agreed that disbarment proceedings are of a civil and not criminal nature. *In Re* T. A. McDonald, 157 Ky., 92; Com. v. Richie, 114 Ky., 366. It is also a general rule that in civil cases neither of the parties can introduce evidence in support of his good character until his character has been attacked by his adversary. But there are exceptions to this rule and classes of civil cases in which evidence of good character may be offered. As said in Greenleaf on Evidence, Vol. 1, Sec. 54: "In civil cases such evidence is not admitted unless the nature of the action involves the general character of the party or goes directly to affect it." And so when the nature of the litigation is such as to put directly in issue the character of one of the parties, it is generally ruled that the party whose character is thus put in issue by the nature of the action may introduce evidence in support of it, although his adversary has not sought to impeach it. Evans v. Evans, 93 Ky., 510; Smith v. Lovelace, 1 Duv., 215; Johnson v. Featherstone, 141 Ky., 793; Wigmore on Evidence, Vol. 1, Sections 64-70.

It being, therefore, according to the weight of authority, admissible for a party to give evidence of his good character before it has been assailed when the nature of the suit puts the character of the party offering this evidence directly in issue, it seems particularly appropriate that evidence of good character should be admissible in disbarment proceedings. The Kentucky Statutes provide in Section 104 that no person can obtain a license to practice law in this Commonwealth until he shall first have a certificate from the county judge of the county of his residence "that he is a person of honesty, probity, and good moral character." And we have often held that if an attorney desires to remain a member of the profession, he must continue to retain the good character he possessed when he secured the privilege. When he loses this good character by personal or professional misconduct, he forfeits his right to the privilege he obtained by admission to the bar, and his name, as we have held, in proper proceedings, should be stricken from the roll of attorneys.

So that in every disbarment proceeding where the nature of the accusation puts in issue the honesty,

probity, and good moral character of the accused, and it is sought to strip him of his license because he is wanting in these qualities, he should have the right to show by those qualified to speak that his character in these respects is good. Disbarment proceedings, although classed as civil, are, nevertheless, of a quasi-criminal nature and necessarily and directly involve the character of the person proceeded against. *In Re* Darrow, ——, Ind., ——, 83 N. E., 1026. The very thing the procedure seeks to establish is that the attorney proceeded against is not a person of honesty, probity, and good moral character, and on account of this delinquency, there should be taken from him a valuable privilege and an honorable title. And so we think the respondent should have been permitted to show in his defense that he was a person of honesty, probity and good moral character. *In Re* Lash, 135 N. Y. Sup., 370; *In Re* Stephens, 84 Cal., 77; Smith's Appeal, 179 Pa. St., 14.

It is also pressed on our attention that the sentence imposed by the judge was entirely disproportionate to the offense, and that the judgment should be reversed for this reason. The judge properly, we think, submitted to a jury the issues of fact involved in this proceeding, and when the jury by its verdict found that the respondent had committed the substantial acts charged in the information, the judge could not well have done otherwise than accept as true these findings of fact. Accepting them as true, it then became his duty to either suspend for a definite period the right of the respondent to practice law or to strike his name from the roll of attorneys and permanently disbar him.

It is said by many authorities that the purpose of disbarment is not to punish the attorney, but to protect the court and the administration of justice from contamination by an officer who has proven himself unworthy. Punishment may not be the prime object to be accomplished in disbarment proceedings, but it cannot be questioned that disbarment is punishment. It would be idle to say that it was not punishment to take from a man his means of livelihood, and at the same time discredit and disgrace him. This, however, is the effect of disbarring an attorney, and this measure of punishment the judge, in the exercise of a sound discretion, may impose. But disbarment is the extreme penalty.

Suspension from practice for a period of time is a lesser one. Which shall be imposed is generally agreed to be a matter in the sound discretion of the trial judge. As said in Thornton on Attorneys-at-Law, Vol. 2, Sec. 894:

"The solution of this question frequently involves so many considerations of public policy and concrete justice, dependent upon the gravity and consequences of the misconduct, the age, character and reputation of the attorney, the probability of his reformation, the circumstances attending the commission of the offense, and the like, that no fixed or arbitrary rules have been, or properly can be, adopted by the courts. * * * It is a generally accepted principle, however, that since the primary purpose of disbarment proceedings is the protection of the courts and the public, disbarment should never be decreed if any discipline less severe would accomplish the desired result, as when there are prospects that the attorney's conduct and character may undergo reformation."

In Bradley v. Fisher, 80 U. S., 335, 20 L. Ed., 646, the Supreme Court said: "A removal from the bar should, therefore, never be decreed where any punishment less severe—such as reprimand, temporary suspension or fine—would accomplish the end desired." Re Sherin, 27 S. D., 232, 40 L. R. A. (N. S.), 801.

In view, however, of the fact that there must be a retrial of this proceeding, when new facts may be developed and new light thrown on the transaction, it is not proper that we should indicate the judgment that should be entered. It may, however, not be amiss to say that, in our opinion, the judgment appealed from, considering all the facts and circumstances in this case, might well have been suspension for a period and not disbarment.

The judgment is reversed, for proceedings in conformity with this opinion.