# Louisville Bar Ass'n ex rel. Drane et al. v. Yonts.

(Decided June 4, 1937.)

As Extended on Denial of Rehearing Nov. 26, 1937.

B. M. VINCENT, Attorney General, for complainant.

S. M. WILSON and JOHN P. HASWELL for respondent.

OPINION OF THE COURT BY JUDGE PERRY—Confirming report of Board of Commissioners of the State Bar suspending Morton K. Yonts from practice of law.

This proceeding is instituted in this court, looking to the disbarment, suspension, or other disciplinary action upon the respondent, Morton K. Yonts, a member of the Kentucky Bar, for alleged unethical conduct in the practice of his profession.

The proceeding taken to reach this court had its inception in certain charges preferred by the complainants, Mrs. Mary L. Drane, her daughter, Mrs. Josephine L. Maurer, and a colored man, Woodson Harper, against the respondent, Morton K. Yonts, of misconduct while serving them in the capacity of an attorney at law.

These charges were lodged with Louisville Bar Association in December, 1933, whereupon its investigating committee proceeded to take testimony concerning them.

Upon completing their inquiry and hearing in the matter, this committee submitted these complaints, presented by affidavits, together with transcript of evidence taken by them, to the commonwealth's attorney of Jefferson county. for his consideration and determination of the propriety of his instituting disbarment proceedings thereon against the respondent, should he conclude upon his examination of the record submitted him that such course was justified.

After a due examination made of such record, it appears by his letter addressed to the trial committee of the State Bar Commissioners that he had thereupon reported to the Louisville Bar Association that he declined to institute disbarment proceedings thereon against the respondent, as in his opinion, "a successful prosecution could not be maintained upon such evidence."

Following this, in April, 1935, these charges preferred, together with the evidence heard by the investigating committee in regard thereto, were referred to and filed with the Board of Commissioners of the Kentucky State Bar, which appointed two of its members as a trial committee, who proceeded to reinvestigate these charges preferred against respondent and to hear further testimony in regard thereto.

The charges preferred by Mrs. Drane embraced five or more counts, those of Mrs. Maurer, three counts, and Harper's, only one.

Upon a hearing by the trial committee of all these charges upon the record submitted it, as well as upon such additional and further testimony as was introduced and heard by it, its two members made separate reports of their findings with their somewhat different recommendations based thereon.

The report of the one, Mr. Hughes, is to the effect that all of the charges made by the complainant, Mrs. Drane, were fully sustained, as also were the charges preferred by Mrs. Maurer, by ample evidence to convincingly show the respondent guilty of the charged unprofessional and unethical conduct, but that the com-

plaint of Woodson Harper should not be considered, in that the evidence as to it was of too uncertain character to show any offense committed.

His recommendation, therefore, based upon such findings, was that, to protect the public against a repetition by the respondent of the proven offenses, he should be ruled to show cause why he should not be disbarred.

The less inculpating report of the other commissioner, Mr. Burke, is to the effect that while his findings upon the evidence also were that the conduct of the respondent, in respect to some of the matters or counts embraced in the Drane complaint, was clearly subject to censuring criticism and not to be approved, yet, after due consideration of the whole record, he was unable to agree with his associate trial commissioner that respondent should be disbarred or that the charges preferred by the complainant, Mrs. Maurer, should be sustained, but that for the Drane charges preferred and in part found sustained, a severe public reprimand or a brief suspension from practice of the respondent was justified and should be imposed.

Thereupon, the matter was heard upon the record, reports, and briefs of counsel by the full board, which made and adopted the following findings and award: That counts Nos. 1, 2, and 4 of the Drane complaint should be sustained, the others dismissed; that count No. 3 of the Maurer complaint should be sustained and the others dismissed (leaving approved the committee's report that the Harper complaint be not considered); and further recommending its award made, that the respondent, Morton K. Yonts, "be suspended from the practice of law in this state for the period of one year."

The respondent, both by demurrer and response, attacks the constitutionality of section 101, Kentucky Statutes, and its subsections and the rules of this court adopted in pursuance thereof, and further, by demurrer and plea, insists that the charges made fail to state facts sufficient to support or constitute the charged offense of unprofessional conduct.

As to the federal questions here raised and most insistently urged by the appellant's challenge to the constitutionality of the disbarment proceedings, here followed and conducted pursuant to the provisions of the State Bar Act of 1934 (Kentucky Acts, Regular Session, 1934, pp. 5, 6, c. 3; Ky. Statutes, 1936 Edition, secs.

101-1 and 101-2), and rules of court adopted under and pursuant to said act, as construed and administered by this court, we deem it sufficient answer thereto that we have, both in this and in the several prior disbarment proceedings prosecuted under said act, looking to the enforcement of the professional ethics of the Bar, among which may be cited Com. ex rel. Ward v. Harrington, 266 Ky. 41, 98 S. W. (2d) 53, and In re Sparks, 267 Ky. 93, 101 S. W. (2d) 194, after a very careful consideration of these and like attacks and arguments advanced in support thereof, reached the conclusion that the said act and rules of court are not violative in their prescribed procedure of either the State or Federal Constitution and have in each instance decided adversely to these contentions made against their validity, in that we find in these provisions of the act no denial of the equal protection of the laws nor any abridgment of the privileges of the citizen.

In these cases of Commonwealth ex rel. Ward v. Harrington, 266 Ky. 41, 98 S. W. (2d) 53, and in re Sparks, 267 Ky. 93, 101 S. W. (2d) 194, we determine these questions, saying in the course of our opinion given in the latter case, discussing and disposing of this question, as follows:

"In Commonwealth ex rel. Ward v. Harrington, 266 Ky. 41, 98 S. W. (2d) 53, decided November 6, 1936, the validity of section 101-1 et seq., in so far as it applies to disciplinary proceedings in this court, was expressly upheld. It was pointed out in that opinion that an investigation looking to the disciplining of an attorney at law was not an 'adversary' proceeding and was not therefore within the class of litigation over which the Court of Appeals has 'appellate jurisdiction only.' The opinion is not only sound in principle, but it is sustained by authorities from this and other jurisdictions to the point of demonstration. For example, see In re Richards, 333 Mo. 907, 63 S. W. (2d) 672; State v. Cannon, 196 Wis. 534, 221 N. W. 603; Legal Club of Lynchburg v. Light, 137 Va. 249, 119 S. E. 55. The power to regulate the conduct and qualifications of its officers does not depend upon constitutional or statutory grounds. It is a power which is inherent in this court as a court—appropriate, indeed necessary, to the proper administration of justice. That we have in deference to the Bar Inte-

gration Act (Ky. Stats., secs. 101-1, 101-2), set up a standing Board of Commissioners and machinery to conduct and report on investigations concerning the conduct of attorneys, does not alter the fact that we are but exerting an inherent power. * * *

"The argument that this is an arbitrary power which the court is arrogating to itself or accepting from the Legislature likewise misconceives the nature of the duty. It has limitations no less real because they are inherent. It is an unpleasant task to sit in judgment upon a brother member of the bar, particularly where, as here, the facts are disputed. It is a grave responsibility, to be assumed only with a determination to uphold the ideals and traditions of an honorable profession and to protect the public from overreaching and fraud. The very burden of the duty is itself a guaranty that the power will not be misused or prostituted. The power is not made arbitrary merely because it exists in this court as well as in other courts of the Commonwealth. If not an arbitrary power in other courts, it is not arbitrary here."

Now looking to the nature, evidence, and merit of the several items of complaint preferred by Mrs. Drane:

The first relates to her charge and supporting evidence that the respondent, in handling certain litigation for her in respect to what we will refer to as the "Graves property," was guilty of unethical conduct. As to this, the facts are clearly shown, and admitted, that Mrs. Drane held a second mortgage on this certain property which she had earlier sold Mrs. Graves for some $5,000 and that the Liberty Bank of Louisville held a first mortgage on it, reduced in its amount at this time to some $1,400; also that Mrs. Graves had for some time previous stopped making the agreed monthly payments upon these debts owing by her to Mrs. Drane and the bank, and had also suffered the taxes thereon to become delinquent, for which the property was sold to one Emmanuel Faust.

In this situation, in February, 1932, Mrs. Drane, on the advice of her daughter, Mrs. Maurer, had employed the respondent to foreclose her mortgage on the Graves property, at the time paying him a fee of $150, and on April 4, following, he filed the foreclosure suit. On the day after the filing of this suit, or April 5, it appears that Mrs. Graves having abandoned her pos-

session of the property and turned the keys thereto over to the bank, the senior mortgagee, with the request that it sell it, Mrs. Drane when learning of the exposed and open condition in which the property had been left by her and then having an applicant to rent it, conferred with the respondent as to whether she had the right at that time to rent it, and upon being advised that she had the right to rent it, did so.

The respondent answers that such advice was in good faith given to her, in the belief that as the property had been abandoned by Mrs. Graves, and as the bank, the first mortgagee, did not object to her renting it, and also that as she had purchased from one Emmanuel Faust his tax deed to the property, he was of the opinion that she could legally rent it and should pay the $25 monthly rentals received into court, for later therewith caring for the the bank's senior lien debt.

Mrs. Drane testifies it was agreed that the monthly rentals (which she collected for eleven months) were to be turned over by her to the respondent to pay them into court for this purpose, but that after receiving them, he failed to do so. Also, she complains that while the respondent was then advised that Mrs. Graves was threatening to file an action of trespass against the complainant, for having wrongfully rented this property before she was entitled to the possession of it or had acquired title thereto, he did nonetheless advise her to continue renting it, as the result of which she was sued by Mrs. Graves and upon trial of the case in November, 1933, she recovered judgment against her for some eleven months rental, amounting to nearly $300, with punitive damages in the sum of $1,500.

Also, it is shown that while the respondent states that he advised Mrs. Drane on April 5, 1932, to rent this property on the grounds that she then had the right to its possession by reason of the Faust tax deed, he at such time had not purchased this tax deed for her nor did he purchase it until some several weeks later, or on May 24, 1932, by reason of which fact she complains that his claimed justifying ground being untrue, he did not in good faith advise her to rent it, but did so for the self-serving purpose of receiving the monthly rents collected by her. Also, it is a further item of her complaint as to this that she, at the request of respondent, paid over to him some $384.69 for the pur-

chase of this Faust tax claim and deed held by him to the property, when respondent purchased same as her attorney, for the lesser sum of $286.87 and took the deed from him to Mrs. Drane to the property, but did not account to her for the unexpended balance of the $384.69 intrusted to him for such purpose.

The respondent's position as to this is that even though his advice given to Mrs. Drane as her attorney to rent the property did later prove costly to her, in its being regarded as altogether erroneous by the trial court, it was yet given to her in good faith, and which was, upon the later appeal of the case to this court, substantially confirmed by a reversal of the lower court's judgment wherein it was held not only that Mrs. Graves was not entitled to recover, but that a peremptory instruction should have been given for the defendant, Mrs. Drane, in that action.

A further item of Mrs. Drane's complaint against the respondent is that at the time of the filing of the foreclosure suit against the Graves property, as she then held a first lien or tax deed against it, which she had purchased from Faust, and also a mortgage lien against the property second to that of the Liberty Bank & Trust Company, amounting to some $1,400, she was led to believe that the bank might, under such circumstances, sell its note and mortgage to her for an amount somewhat less than its debt, and that for such purpose she paid over to the respondent $900, for the one and express purpose of acquiring the bank's first mortgage lien debt against the property. A receipt was given by respondent to Mrs. Drane, showing that it was so received by respondent and stating "the exact amount required for this purpose to be determined later."

The bank, however, declined to sell its mortgage debt for less than its full amount. Whereupon, respondent retained in his hands this $900 unapplied to the object for which it was given him, though it is shown it was expended to the extent of about $600 in paying, for the benefit of Mrs. Drane, the costs, etc., incurred in her foreclosure suit.

It is further complained that upon the later directed judicial sale of the Graves property, ordered in Mrs. Drane's foreclosure suit, although the Liberty Bank's representative and bidder at the sale bid on the property something less than the amount of its then

debt of $2,275, respondent needlessly overbid the sum of $2,500 therefor or some $300 more than the highest bid made by the bank, which it was contended was improperly done with a view to satisfying with the surplus (some $300) the respondent's indebtedness then unsatisfied and owing to Mrs. Drane for the balance of the $900 advanced him by her to care for this property, for which he had not given her an accounting.

Respondent's testimony and explanation of this charge is that the bid made by him, even though it developed it was more than necessary, yet in nowise was thought nor proved to be hurtful to the interests of Mrs. Drane, in that she was thereby bidding in the property at a cost to her of only the bank's first mortgage debt, regardless of the amount of her bid made therefor.

Further it is complained that having bid in the property and while respondent had some $300 of Mrs. Drane's funds (as shown above) in his hands, which had been intrusted to him for taking care of the Graves property matter, he yet wrongfully and repeatedly failed and refused to make the cash payment of $200 required of her as purchaser of the property at this judicial sale, thereby suffering his client to be brought into court upon a rule to show cause why she should not be punished for contempt for having failed to make this cash payment by the court previously ordered.

Back of this and thus showing, it appears from the commissioner's report that when Yonts at the sale bid in the property for Mrs. Drane, he requested that she be allowed to postpone payment of the cash deposit of $200 until the afternoon, assuring the commissioner and the representative of the mortgagee bank that he would be personally responsible for such deposit, to which they agreed; that Yonts had been repeatedly called upon to comply with the terms of sale by making the promised cash deposit, which he failed to do; but that it was paid only upon the hearing of a later rule issued against Mrs. Drane and the court's reducing the cash payment to $140; also, that in response to the first rule issued against Mrs. Drane, which was not signed by her, the respondent had stated that he had effected arrangements with the Liberty Bank, through a Mr. Marner (now dead), whereby the bank would finance this mortgage debt, but which statement the witness for the bank testified he had investigated and found to be altogether untrue.

Criticizing the character of these and other dealings of respondent in evidence, it is contended, and it would appear successfully, that such conduct on the part of respondent showed a dereliction and delinquency on his part in the discharge of his professional duty and obligation to care for and protect the interests of his client, resting in his hands as her attorney.

Also, it is shown that Mrs. Drane was further embarrassed and put to a further loss and expense by the failure of the respondent to pay her taxes upon the property, which he was by her requested to do and promised to do for her out of her funds he then held in his hand, but upon which, it is admitted, he only made one installment payment of a one-fourth part of their amount.

It is again further shown (and admitted) in evidence that while respondent was thus holding the fiduciary relationship of advisor and counsel to Mrs. Drane, a woman then past seventy years of age, and inexperienced in matters of business and the capable management of her small estate, and when he was informed and advised, by reason of such relationship and intimacy with her affairs, as to its amount and character, he upon one occasion, at his express solicitation, received from her either as a loan or for investment purposes the sum of $1,400, which she had secured upon his advice by pledging certain shares of building and loan stock she then owned and for which respondent, either as security for his payment of the amount, if loaned him, or else as representing his investment for her of the amount, if so put in his hands, gave complainant a long past-due note in such amount of a colored woman, Ethel Dickerson, which purported to be secured by a mortgage on her home in Louisville.

It is contended by Mrs. Drane that this $1,400 was given to the respondent for investment purposes, and that his handling of the same, whether as an investment or even as a secured loan, was fraudulent and an abuse of her confidence by him as her counsel, in that the Dickerson mortgage note and security was of questionable value, particularly when the maker of the note denied that she had ever executed a mortgage on her property, securing payment of her note made to respondent in consideration of fees owing him and $500 which he had advanced her.

As to this, Mrs. Drane states that respondent refused to sue and collect this questionable mortgage debt owing by the Dickerson woman, who, it is admitted, had paid neither the respondent nor her any part of the principal or any interest thereon, but that the respondent had himself paid her 8 per cent. on this note, secured by a disputed mortgage lien, alleged dumped on her by her attorney, the respondent.

However, respondent's evidence tends to show that this transaction, whether it was an investment of her $1,400 given him, or was a loan to him of the amount and so secured by the Dickerson mortgage note, was in either event not a fraudulent transaction, but one that had proved profitable to her, in that 8 per cent. interest had been regularly paid her thereon and further that it was secured by a mortgage on property which had been appraised by a building and loan association, to which an application for a $1,500 loan had been previously made, as being then of the market value of $2,700 and having a replacement value of $4,000, and which approved a loan thereon of $1,500.

Again, Mrs. Drane further complains of another transaction had with the respondent, in which it is contended she was overreached by him and in which what we will refer to as the "Callahan note" for $700 was turned over to her in consideration of the sum of $500 paid him.

There is a dispute as to whether the $700 was turned over to respondent as a loan, which Mrs. Drane had obtained, in order to accommodate him, by pledging certain shares of her gas and electric stock. When this $700 was turned over to respondent, he gave a receipt, which recited that it was for a $700 loan made him, $200 of which he had paid her upon his obligation owing to her.

Respondent explains this as a sale of the Callahan note to Mrs. Drane, which it appears was an accommodation note executed by Callahan without consideration therefor and the date of which was changed by respondent at the time of its transfer to her; also, that the payment of this note was secured to Mrs. Drane by four shares of realty stock, shown by the evidence to be reasonably worth three times the amount of the note.

Respondent contends that this was a loan made him by his client of $700, for which a $700 note was given

her, secured by the ample and safe pledge of this realty stock, and that even if these borrowing transactions indulged in by him with his client, Mrs. Drane, were subject to criticism as being improper and in bad taste, they yet involved no immoral attribute, where they were not fraudulent or hurtful to the interests of his client.

Another count or item of Mrs. Drane's complaint is that she turned over $400 to the respondent to invest for her, $200 of which he did invest in what is referred to as the "Gunterman note" which was finally paid her in weekly installments, but that no investment nor accounting was made of the remaining $200.

Yet another and final item of Mrs. Drane's complaint refers to the respondent's drawing of a will for her, wherein she claims that he wrongfully, and without her knowledge or consent, named himself as her executor, with large powers vested in him as such in the administration of her estate.

Respondent's reply to this is that the will was made exactly as directed by her, that his naming of himself as executor therein was due to her express insistence that he do so, and that the powers conferred upon him thereunder were in no sense self-serving ones nor gave him any undue authority or improper advantage in acting as her executor; also, that at the time of drawing her will, which was attested by several witnesses, he gave her a copy of it, which she retained, but that, upon her later request, he had returned her the will and made no charge to her for its drafting.

After these charges were preferred, respondent filed a report in connection with the Graves case, supra, showing that the respondent received from Mrs. Drane different payments thereon amounting to $1,509.69 and had paid out on behalf of Mrs. Drane, in connection with the case, a total of some $2,172.72, and further, when testifying before the board of commissioners in 1935 as to these complained of transactions had with Mrs. Drane, he stated that while he had first been charged with an indebtedness in her favor of some $2,700, the same had been reduced by payments made from time to time to Mrs. Drane's attorney, whereby he had paid back every dollar received from her as his client for the above-named special purposes and then owed her only eight or nine hundred dollars, representing the balance upon a personal note owing her.

While the true amount owing was found to be more than the sum stated, it is yet agreed that the entire indebtedness had either been repaid, or else full restitution effected of any balance remaining by pro tanto assignment of fees owing him to her sufficient to satisfy same. Such restitution, however, of funds of a client improperly converted, especially where made after charges are preferred, does not effect a condonation of the attorney's misconduct, but may only be considered as being in mitigation of the degree of disciplinary action called for. Commonwealth v. Roe, 129 Ky. 650, 112 S. W. 683, 685, 19 L. R. A. (N. S.) 416; 43 A. L. R. 68 and 75; Denny v. Com., 175 Ky. 357, 194 S. W. 330; also see Com., etc., v. Hinton, 254 Ky. 798, 72 S. W. (2d) 481, and authorities therein cited.

Next referring to the Josephine Maurer complaint made against respondent: We feel it is here sufficient, in order to avoid an undue extension of this opinion by a too detailed statement of all the items of her complaint, to briefly mention only that one of the three counts embraced in Mrs. Maurer's complaint which was sustained by the finding of the full board and which related to respondent's pleadings that Mrs. Maurer, in connection with his employment by her to identify and apprehend the writer of certain scurrilous, anonymous letters received by her, had also employed him as her attorney in her suit against her husband for divorce.

The evidence as to this was that respondent was conducting a divorce proceeding for complainant and a number of scurrilous letters were received involving and reflecting upon Mrs. Maurer; that respondent, upon receiving one of these anonymous letters, called Mrs. Maurer and advised that she take steps looking to the identification and apprehension of their author, with a view to criminal proceedings against him. Looking to the accomplishment of this, Mrs. Maurer states that respondent advised that it would be necessary to employ handwriting experts, for which purpose she paid him $150, which was to be so expended, he stating that he would charge her no fee for his own services in connection therewith. She states that he employed two experts, paying one of them $10 for his report as to the authorship of these anonymous communications, but the other nothing, and retained the remainder of the $150 given him for satisfying the experts' fees.

Respondent, on the other hand, states that the $150

was not so paid him, but was paid him both for his fee and for the expenses incurred in investigating the authorship of the letters and that, it being ascertained that the author of the letters was Mrs. Maurer's husband, the matter was dropped. The remainder of the payment made him was retained as his fee, which was understood by them both at the time and recited in his receipt therefore given Mrs. Maurer; that while he only paid one of the experts employed, the other left the state without ever having made a report as to the authorship of the written instruments submitted him.

The other two items or counts of Mrs. Maurer's complaint, which the board upon the evidence heard found should be dismissed as insufficient to show misconduct of the respondent therein, we, concurring therewith, will not discuss.

The questions, therefore, here presented and remaining for our determination are (1) whether the reported finding and award of the board of commissioners is justified and supported by the evidence, and (2) if approving such finding, we also concur in the disciplinary award of a year's suspension imposed by the board upon respondent therefor.

We have carefully read and considered the two records, setting out the proceedings investigating these complaints made against the respondent, wherein he appeared in person and by attorney and presented both by pleading and his testimony his defense to the charges preferred against him.

We feel it not unfitting that we should here acknowledge our appreciation and approval of the unselfish labor and the fair manner in which this investigating work and inquiry was conducted by both the investigating committee of the complainant, Louisville Bar Association, and the Board of Commissioners of the State Bar.

After a mature deliberation, we are of the opinion that the evidence heard fully supports and sustains the findings and award made by the full Board of Commissioners.

While the procedure here followed, which is authorized by the late statutory enactment referred to supra, and the rules of this court, made and adopted pursuant to its provisions, may be new, the principles

applied in determining what disciplinary action, if any, should be taken in regard to respondent are in nowise new nor rest upon this recent statute vesting us with the authority to impose disbarment, suspension or other disciplinary action upon the members of the bar, who are officers of the court, for unethical and unprofessional conduct, showing them to be unfit and unsafe persons to enjoy the privilege of managing the business of others in the capacity of attorneys, in that their actions bring reproach upon the legal profession and injure it in the opinion of the public.

Both such power and such duty has, in proper instance, been declared to be vested, as an inherent power, in the court and to rest as a responsibility and duty upon it.

As said in the case of Commonwealth v. Roe, 129 Ky. 650, 112 S. W. 683, 686, 19 L. R. A. (N. S.) 413:

"Courts independent of statutes have at all times possessed the inherent right to control and regulate the official conduct of their officers, and to inflict upon them punishment for official misconduct. Attorneys at law are officers of the court, and it has always been the rule in this state that, when the attention of the court in which they practice was called to acts of professional misconduct, it had the right to disbar them if the facts of the case justified the infliction of this punishment. Thus, in Rice v. Commonwealth, 18 B. Mon. 472, the court in speaking of the right to disbar an attorney said: 'If a court have knowledge of the existence of such official misconduct on the part of any of its officers, it not only has the power, but it is its duty, to institute an appropriate proceeding against the offender, and to bring him, if guilty, to condign punishment. Attorneys at law are officers of the court. The official misconduct of an attorney at law may be inquired into in a summary manner by the court, and, if guilty of such misconduct, his name may be stricken from the roll of attorneys admitted to the practice of law at the bar of the court.' In Baker v. Commonwealth, 10 Bush, 592, the court said: 'When an attorney commits an act, whether in the discharge of his duties as an attorney or not, showing such a want of personal or professional honesty as renders him unworthy of public confidence, it is

not only the province, but the duty, of the court upon an appropriate and legitimate presentation of the case to strike his name from the roll of attorneys.' * * * In Bradley v. Fisher, 80 U. S. [13 Wall.] 335, 20 L. Ed. 646, the court said: 'The power of removal from the bar is possessed by all courts which have authority to admit attorneys to practice. It is a power which should only be exercised for the most weighty reasons, such as would render the continuance of the attorney in practice incompatible with the proper respect of the court itself, or a proper regard for the integrity of the profession.'

"While this right of disbarment for proper cause is universally upheld as a legislative exercise of power inherent in courts, it ought to be, as well expressed by Chief Justice Marshall in ex parte Burr, 9 Wheat. 529, 6 L. Ed. 152, exercised with great moderation and judgment."

Again do we find these same principles reannounced and declared in the later case of Lenihan v. Commonwealth, 165 Ky. 93, 176 S. W. 948, 955, L. R. A. 1917B, 1132, where it is said:

"Punishment may not be the prime object to be accomplished in disbarment proceedings, but it cannot be questioned that disbarment is punishment. It would be idle to say that it was not punishment to take from a man his means of livelihood, and at the same time discredit and disgrace him. This, however, is the effect of disbarring an attorney, and this measure of punishment the judge, in the exercise of a sound discretion, may impose. But disbarment is the extreme penalty. Suspension from practice for a period of time is a lesser one. Which shall be imposed is generally agreed to be a matter in the sound discretion of the trial judge. As said in Thornton on Attorneys At Law, vol. 2, sec. 894:

" 'The solution of this question frequently involves so many considerations of public policy and concrete justice * * * that no fixed or arbitrary rules have been, or properly can be, adopted by the courts. * * * It is a generally accepted principle, however, that since the primary purpose of disbarment proceedings is the protection of the courts

518

and the public disbarment should never be decreed, if any discipline less severe would accomplish the desired result, as when there are prospects that the attorney's conduct and character may undergo reformation.'

"In Bradley v. Fisher, 80 U. S. (13 Wall.) 335, 20 L. Ed. 646, the Supreme Court said: 'A removal from the bar should therefore never be decreed where any punishment less severe—such as reprimand, temporary suspension, or fine—would accomplish the end desired.' "

Influenced and guided by these declarations of the applicable legal principles, together with the equally potent and persuasive qualifying considerations announced as also counting in determining the proper and rightful degree of penalty to be imposed upon the offending member of the bar found guilty of unethical conduct, we are led to conclude that the lesser penalty here recommended by the whole Board of Commissioners is just and appropriate under the circumstances and should be adopted and here applied by us.

It is, therefore, our opinion that the board's finding and recommendation, that the respondent be suspended from the practice of law in this state for the period of one year, as here made, was proper and it is ordered that its report be and it is hereby confirmed and that respondent, Morton K. Yonts, be and he is hereby suspended from the practice of law in this state for the period of one year.

Whole Court sitting, with the exception of Judge Clay, who was absent.