## In re Carter.

Feb. 23, 1940.

Hubert Meredith, Attorney General, **and W. Owen Keller**, Assistant Attorney General, for complainant.

Haynes Carter for respondent.

OPINION BY MORRIS, COMMISSIONER—Confirming report of committee.

On September 8, 1938, the investigating committee of the Louisville Bar Association filed complaint charging respondent with unprofessional conduct as a lawyer, "by the employment of paid runners and solicitors in damage suit cases, and in order to procure employment had made false statements pertaining to himself and others."

The respondent filed a response in .which he demurred to the complaint; moved to strike from the records . the transcript of evidence heard - before Judge Field. He denied that he had been guilty of any of the matters charged, or of unprofessional conduct.

Upon a separate hearing the trial committee investigated the charges in each of six instances; dismissed as to two of them, but sustained the charges as to the Knight, Moore, Kelley and Boone complaints, and thereafter recommended to this court that respondent be suspended from practice for a period of one year, and suffer public reprimand. Respondent is here asking a review, and that upon such the committee's recommendation be denied. We take up the Kelley case first.

On March 31, 1938, about 6 a. m., Kelley was struck by an automobile, receiving slight injuries. Within less than an hour Col. Hunt approached Kelley's wife and took her to the City Hospital, where Kelley was receiving aid. They remained there a short while, and though Kelley was in a somewhat dazed condition, the three returned to the Kelley home where Kelley signed a 50% contingent contract. Kelley was of the belief that Hunt was an attorney; neither he nor Mrs. Kelley read the contract. A few days later Mrs. Kelley called Carter's telephone number and asked for Hunt. He was not in the city, and respondent answered the phone. He learned that it was Mrs. Kelley talking, and said to her: "You are the lady I am looking for; I want to hear everything." She replied: "If you are as crooked as .Mr. Hunt I don't want you or Mr. Hunt around me."

In the meantime it appears the Kelleys called in

another lawyer, a personal friend, who they employed to take charge of the case, and he later filed suit. The Kelleys had one of respondent's cards, apparently left by Mr. Hunt.

In a letter dated March 31, the day of the accident to Kelley, respondent wrote to the owners of the truck notifying them of the injury to Kelley, and asked for the name of their insurance carrier, so he could take the matter up with them. This letter was referred to the insurance company's claim manager, and he received it about the same time summons was served in the suit filed by the attorney later employed by the Kelleys. The manager, Mr. Dixon, called respondent and told him of the service of the summons, and respondent said that he had heard of the suit, "so just forget it."

Respondent says, as to the Kelley complaint, he knew nothing of the accident or injury, but during the same day Hunt called over the phone and told him that Kelley, a friend of his, had been injured, taken to the hospital and thence home, and wanted respondent to represent him in a damage claim. In the conversation respondent learned from Hunt sufficient facts upon which to base the letter which he wrote to the owners of the automobile.

He stated that Hunt at that time had no contract blank or business cards of respondent, and was not authorized to solicit for him or promised reward for "recommending respondent in any case." Respondent then goes into an analysis of the Kelley's evidence, the purpose being to demonstrate that Hunt was in no wise soliciting for him. In doing so he fails to consider the main portion of the Kelley testimony, which is not impeached, and which we conclude shows that Hunt, at the time, was using his efforts in behalf of respondent.

In the Moore complaint, the writer of the report for the committee remarks that "there are mysterious angles to this case which the evidence does not explain." Moore was injured by being struck by an automobile at about 6 p. m., on Saturday, February 26, 1938. An attendant at the hospital where Moore was taken says that on Sunday morning a visitor called to see Moore. The witness identified a picture of Hunt, and said he was the visitor. Moore was unconscious, and Hunt did not talk

to him. On the next day respondent wrote to one Jenkins, the driver of the car which had injured Moore, advising that he had been employed by Moore to represent him in a claim for damages for injuries, and asked Jenkins to furnish the name of the insurer. Jenkins received the letter on the Monday morning following, and went to see Moore, but failed, as he was still unconscious, and the interne and a nurse say that Moore remained unconscious for several days.

Respondent had a contract bearing Moore's signature, ostensibly by mark, and the records of the Jefferson circuit court showed that suit was filed by Moore v. Jenkins on the 28th; the set slip named respondent as attorney for plaintiff.

Respondent says that Moore was a blacksmith who followed the races. Moore was known very well to respondent's son-in-law, who lived with respondent at St. Matthews. It was learned from a newspaper that Moore had been injured, and later in the day respondent visited the hospital, saw Moore and told him that he was the father-in-law of Shipley, and that if Moore had no preference, he, respondent, would be glad to look into his case, and inform him of the facts learned, and if he had no attorney, and the facts manifested liability, he would like to represent him on the claim, which was agreeable to Moore. He did not know Moore, but had a description, and in looking for Moore met Grafton Bennett, who he thought was an orderly, and Bennett pointed out Moore, and was later called upon to witness Moore's signature to a contract. Moore was not later located, but after some delay, "through accident," Bennett was located, and in testimony corroborated respondent.

Some of the "mystery" arises from the fact that while Carter and Bennett say that Moore signed by mark, because his right arm was in a sling, the testimony of the attending nurse shows that the left arm was the one which had been injured. Respondent was uncertain as to the arm that was injured, or as to whether Moore told him he could not write. Moore's signature was not in the handwriting of respondent. He does not claim that Bennett wrote it. Respondent wanted some one connected with the hospital to sign the name, so that nobody would raise a question. He admits that both

Bennett and whoever signed the Moore contract (not mark) were strangers to respondent. The committee also found that the date and place of the accident and the address of Jenkins had been changed. Respondent says he never saw Moore again; that he had disappeared. The pleadings were completed in the suit; respondent filed a reply, and did not again appear. The suit was dismissed.

The Boone case was next considered. J. R. Boone and his brother were in a collision between the automobile in which they were riding, and a bus belonging to the Louisville Railway Company. The accident occurred near 5:20 p. m., April 4, 1938. Their personal injuries were slight, but the car was damaged to a considerable extent. Around 7 p. m., the same day, in response of a telephone call the brothers went to respondent's office in the Republic Building. When they arrived they found Hunt in the office. Hunt obtained one of respondent's blank contracts, and J. R. Boone signed it. Boone was of the belief that Hunt was the respondent. A few days later Boone returned to the same office and met respondent, who said: "Well, I am Mr. Carter, and am handling your case."

Respondent stated that Hunt had called him from the office while he was at home and said there was a man in the office "about a cause for damages." Respondent said he refused to go into town, but told Hunt he could get a contract out of his desk and let him sign it. Hunt said the man wanted to talk to him over the phone, and respondent talked to Boone, and suggested he sign the contract which Hunt would give him. Boone emphatically denies this, stating that Hunt only made two calls one to the Cook Garage and the other to the Phoenix, both to arrange a transfer of the damaged auto, in which Hunt manifested considerable interest.

On April 5, respondent wrote a letter to the Railway Company which they received on the 6th; in this letter the company was advised that he represented Boone. Thereafter a controversy arose between Boone and respondent, as to whether his percentage fee would prevail in recovering damages to the car, as well as to claim for personal injuries. There was apparently no agreement on this controversial point, and Boone, by

letter, discharged respondent. This resulted in checking of a pending settlement of the claim for car damage.

There was further element of controversy, in that Boone was objecting to a storage charge by the Phoenix Garage, on which it appears he later got a reduction, at the instance of respondent.

Respondent tells of the claimed conversation between himself and Hunt, saying that Hunt insisted on his coming to the office at once, since the man "works during the day, and can't come in tomorrow." He then relates a conversation (over the phone) with the man whom he thought was Boone. He was finally told, "if you want me to represent you, the fellow there will give you a contract and you can sign it, and then come in at your convenience." No mention was made of a fee.

Respondent then relates in detail and quite at length the misunderstanding as to the fees in respect of the claims for personal injuries and property damage. Boone did not want to pay "anything on the car claim." They came to no agreement; later Boone came back and told respondent he did not want him any longer as his attorney. Respondent requested $50 as a reasonable fee up to that time. Boone would not agree. Later the letter came noting respondent's discharge, and respondent wrote to Boone and the Railway Company to the effect that he was asserting a lien, and Boone later came to the office, "mad as he could be," and told respondent that the Phoenix Garage was overcharging him for repair work; respondent disclaimed any connection with this part of the matter. Boone threatened to communicate with the local association, and respondent, after some talk with the Phoenix manager, had him "knock off $15.00, if payment was promptly made." This was reported to Boone, and he "blew up again." Respondent still insisted on his $50 for services rendered, "as far as he had gone." He finally released his lien and passed out of the case.

The Knight case presents a different situation. The testimony of both Hunt and respondent, given at a hearing before Judge Field, wherein the court was endeavoring to ascertain which one of four attorneys was entitled to represent plaintiff in the case of Margaret, Knight v. W. D. Burch, a damage action pending in

Judge Field's court, was offered. Such testimony as was adduced was transcribed. Both Carter and Hunt testified under oath. When the testimony of the two witnesses was proffered in the hearing of the complaint against respondent before the trial committee, respondent strenuously objected on the ground that he was subpoeaned in Judge Field's court, and was not then aware of the fact that his testimony, or that of Hunt's, would be used against him. Also that he did not have the privilege of cross-examining Hunt. The committee's report recites:

"Your committee not then being as fully acquainted with the facts of the Knight hearing as they now are, admitted Mr. Carter's testimony at that hearing but excluded Hunt's testimony. Your committee now is of the opinion that it erred in refusing to admit the transcript of Hunt's testimony as the transcript of the Knight hearing shows that preliminary to the hearing Judge Field made a statement that as it appeared the particular matter might have ramifications beyond his capacity to investigate, he had asked the Bar Association to take up the matter and go ahead as far as his information and investigation might lead them into general conditions and to take charge of the Knight matter; that the investigating committee conducted the examination, that a separation of the witnesses was made, excepting however, the four counsel of whom respondent was one, and that counsel were permitted to interrogate the witnesses.

"Mr. Carter was thus warned that this was a general investigation which would include his actions and he had the right to question Hunt and the other witnesses, but he did not choose to avail himself of this right. His statement that he was lulled into a false sense of security by Mr. Cahill of the Bar Committee, is not borne out by the Knight record or Mr. Cahill's testimony before us. However, your committee, having refused to admit Hunt's testimony, has not considered it."

Respondent's testimony, as said in report, shows that one Berlew, who respondent knew slightly through the medium of the Phoenix Garage, called respondent about 9 o'clock on the morning of March 3, and told him

that a Mrs. Knight had been injured, and that he, Berlew knew the Knights, and he respondent, might get the case. Respondent and Berlew then went to the hospital, and respondent took a contract from Mrs. Knight. Later in the day Mr. Knight came in and approved the wife's contract. At this time respondent loaned Mr. Knight $5. Respondent stated that Mrs. Knight had a good case against the taxicab company in whose car she was riding at the time of the injury.

The next morning respondent received a letter from the Knights telling him he was discharged. Respondent agreed to file the Knight letter and $5 receipt, but evidently overlooked this agreement as the report says they are not in this record.

Fallender, proprietor of the Phoenix Garage, testified that Hunt hung around his place, frequently listening to a shortwave radio in the garage. Whenever an accident was reported he would get in the car with the garage employee and go to the scene of the accident. He saw Hunt with contracts of different lawyers; respondent's blank was one.

It was further shown that Hunt was frequently around respondent's office, when the cases which the committee reviewed (evidently including the two dismissed) were being discussed. Hunt had a key which he used to let himself in respondent's office at night. The testimony further shows that Hunt was a notorious person around the city of Louisville, a brazen braggart, falsely claiming connections with prominent people; he had a criminal record. Evidence of the reputation of Hunt was introduced. An attorney of the Louisville bar, who specialized in the practice of criminal law, had heard him make bold and open statements in the investigation before Judge Field; one to the effect that he was "runner" with twenty years' experience. He had been convicted of impersonation of officers; he was a race tout; at one time he was declared to be an incompetent. "He openly engages in the practice of ambulance chasing." It is unnecessary to detail further the facts which tended to show general reputation.

Respondent testified that he employed Hunt, knowing nothing of his reputation or reliability, not as a runner but to assist in finding one or two missing witnesses

or defendants; this was in February, 1938. For a month or two thereafter he loaned Hunt his automobile, perhaps a half dozen times over a period of a month. Hunt would "touch" respondent for a dollar or two, maybe two or three times a week, in all not more than seven or eight dollars. Hunt charged gasoline used by him in respondent's car, three or four times, and made long distance calls over respondent's phone, which respondent had to pay to the extent of from four to seven dollars. Hunt made no progress in locating the missing persons, and respondent "eased" him out of the office.

The report of the trial committee goes into detail as to evidence introduced by respondent, and comments that Mr. Dye's testimony would indicate that respondent was ignorant of the alleged activities of Hunt. The testimony of respondent's secretary was corroborative, except that she said that she heard that Hunt was a "runner" when he started coming around respondent's office, or at least after the investigation of the Knight case before Judge Field.

The report then takes up the evidence in each case and gives it appraisal, and concludes that respondent utilized the services of Hunt in the Boone and Knight cases. The committee found it difficult to conclude that respondent did not know of Hunt's reputation. "His own association with him was sufficient to notify him of the unreliable character of Hunt." We agree and need not again detail the facts, which undoubtedly lead to such conclusion. "It is self-evident that a man of Hunt's reputation would not solicit cases in the manner shown without some arrangement for payment." We are of the opinion that respondent's failure to demand of Hunt repayment money paid out in the manner shown, was at least part payment.

Respondent advances some technical points of procedure in asserting that this court ought not to approve the committee's report and in an amended brief (as well as original) argues that the "solicitation of business unaccompanied by fraud, misrepresentation, imposition of some kind, is not to be treated as unprofessional conduct," and cites the two Chreste cases, Chreste v. Louisville R. Co., 167 Ky. 75, 180 S. W. 49, L. R. A. 1917B, 1123, Ann. Cas. 1917C, 867; Chreste v. Commonwealth, 171 Ky. 77, 186 S. W. 919, Ann. Cas. 1918E, 122. We

did so hold, but we interpolated the words "other circumstances tending to invalidate the contract," and as the report said:

"If personal solicitation is accompanied by circumstances showing imposition or the absence of good faith, or at a time it is doubtful if the patient knows what he is doing or his condition is taken advantage of, it is our duty to condemn it and to hold it unethical, calculated to deceive, and harmful to the administration of justice."

The above had reference to the Moore case, which was admittedly solicited by respondent after a visit by Hunt, and we agree, without again detailing the facts, that this particular case was as described, "mysterious," and, if possible, should have been clarified by respondent. The strictly technical objections of respondent may be and are fully answered by our opinions in Sessmer v. Com., 268 Ky. 127, 103 S. W. 647; Miller v. Com., 247 Ky. 479, 57 S. W. (2d) 476; In re Stump, 272 Ky. 593, 114 S. W. (2d) 1094; Louisville Bar Ass'n v. Yonts, 270 Ky. 503, 109 S. W. (2d) 1186.

Having given the report of the committee, and such evidence as was considered by it a careful review, we are of the opinion that the report of the committee should be, and it is, confirmed.

The whole court sitting.