## Commonwealth ex rel. Ward v. Harrington.

(Decided Nov. 6, 1936.)

42

B. M. VINCENT, Attorney General, W. OWEN KELLER, Assistant Attorney General, and JOHN M. WAUGH for complainant.

M. O. WHEELER and C. F. PACE for respondent.

EDMOND F. TRABUE, WATSON CLAY, ANDREW DUNCAN, Jr., and HARRY B. McCOY amici curiæ for complainant.

SAMUEL M. WILSON amicus curiæ for respondent.

OPINION OF THE COURT BY JUDGE THOMAS—Sustaining the findings of the Board on two of the preferred charges, and inflicting a penalty of censure by this court.

Our Legislature at its 1934 session enacted chapter 3, p. 5, of the Session Acts of that year, the title to which is: "An Act providing for the adoption and promulgation by the Court of Appeals of Kentucky of rules and regulations defining the practice of law, prescribing a code of ethics governing the professional conduct of attorneys at law and the practice of law, establishing practice and procedure for disciplining, suspending and disbarring attorneys at law, providing for the organization and operation of a Bar Association, prescribing fees to be paid for the administration of this Act, and the collection and disbursement thereof." By its first section it purports to confer authority upon the Court of Appeals to adopt and promulgate rules and regulations from time to time (a) defining practice of law; (b) prescribing a code of ethics for attorneys at law; (c) establishing rule of practice or procedure for disciplining attorneys; (d) for organizing and governing a State Bar

Association, composed of attorneys at law in the commonwealth; and (e) prescribing and fixing a schedule of fees for the purpose of creating a fund for the administration of the act. Section 2 of the act says: "When and as the rules of Court herein authorized shall be prescribed, adopted and promulgated, all laws or parts of laws in conflict therewith shall be and become of no further force or effect to the extent of such conflict." It is the attempted delegation of authorities (a), (b), (c), and (d) that are some of the questions involved on this hearing.

The act is now sections 101-1 and 101-2 of Baldwin's 1936 Revision of Carroll's Kentucky and 1936 Ed. Kentucky Statutes. Following its taking effect the Court of Appeals framed and promulgated a set of rules and by-laws for the organization of attorneys in the commonwealth into a State Bar Association. Rule 2 prescribed for the creation and establishment of a Board of Commissioners of the State Bar Association to be designated and known as "The Board," which "shall act as administrative agents of the Court of Appeals for the purpose of enforcing such rules and regulations as are prescribed, adopted and promulgated by the Court of Appeals under the aforesaid act." (1934.) By rule 12 authority is conferred upon the Board in the manner therein pointed out to hear complaints filed with it against members of the bar for such violations of the rules of ethics and professional deportment as call for disciplinary action, either a mere reprimand, or suspension from the right to practice for a definite period, or total disbarment. The method of procedure and practice before the Board, after the giving of explicitly prescribed notice to the accused, is clearly set out therein.

The relator in this investigation, W. J. Ward, filed certain complaints with the Board against the respondent, J. L. Harrington, in which he was accused of the commission of certain acts which the relator insisted disqualified him for practicing law; a portion of which concerned official misconduct of respondent as commonwealth's attorney for the Twenty-Fourth circuit court judicial district of this commonwealth, while the others concerned his practice in representing litigants in their private and individual litigation with others. The Board assembled and heard evidence and made its recommen-

dations in writing and filed them in this court. It dismissed a number of charges because of remoteness of occurrence (five years or more) prior to their filing by the relator. Of the others it sustained two of them and dismissed the remainder as not sufficiently established by the testimony.

Defendant in the rule issued by this court, in response thereto, makes defense based upon two grounds: (1) That this court has no jurisdiction in the premises, because of two reasons, (x) that section 110 of our Constitution limits its jurisdiction to appellate hearings only and that this procedure, originally filed in the Court of Appeals, is not an appellate one, and (y) that the 1934 act, supra, is unconstitutional and void because, as contended, it is an unauthorized delegation of legislative authority to the court contrary to section 28 of our Constitution. If in error as to the subdivisions of ground (1), then (2) that the evidence does not sustain the findings of the Board in the two charges it sustained. It will thus be seen that the response presents for our determination two questions of law (x and y, supra), and one of fact. They will be answered in the order named, taking up first legal question presented by reason (x).

It is gratifying, as well as enlightening, to read the briefs filed in behalf of respondent in support of the two divisions in support of ground (1). Of course the position of such learned counsel—and particularly with reference to reason (x)—is, that we cannot function at all except as is prescribed in section 110 of our Constitution, saying in part: "The court of appeals shall have appellate jurisdiction only, which shall be co-extensive with the state, under such restrictions, * * * as may from time to time be prescribed by law." The other sentence of the section confers power on this court "to issue such writs as may be necessary to give it a general control of inferior jurisdictions." Clearly, this proceeding is not embraced by any power conferred by that last sentence, and the question then is, whether it is prohibited by the first excerpt taken from that section (110) of our Constitution, as is argued by learned counsel, and which, if true, would—as he also insists—deprive this court of the right and authority to hear and determine this investigation, and that a dismissal of the charges preferred against respondent for the lack of necessary jurisdiction in this court should be entered. A like con-

sequence would result if reason (y) should be sustained, since in that event the board that investigated the charges and made the report filed in this court would be an unauthorized one, because its creation and authority emanates from rules prescribed and promulgated by this court pursuant to alleged wrongfully delegated legislative authority under the 1934 act.

Opposing counsel (amici curiæ and employed) with equal learning and vigor combat the arguments of counsel for respondent in their effort to sustain the two legal divisions of ground (1); neither of which, as they (opposing counsel) maintain (and we think successfully), is sustainable, and that there exists no legal obstacle (constitutional, statutory, or otherwise) in the way of this court entertaining this hearing, and disposing of it according to the law and the facts. The fundamental error of the learned counsel for respondent, as we conclude, consists in their failing to recognize the distinction between a governmentally created court machine as an implement of government, and what it may do when functioning in discharging the purpose of its creation. We shall refer to the two statuses as "inactive" and "active" courts.

The institution called a court is a governmental machine, created by the people of the sovereignty for the accomplishment of an essential purpose in the preservation of civilized society. That purpose, briefly stated, is to investigate and adjudicate controversies between citizens when they are unable to amicably adjust them; and between citizens and the government, or some of its subdivisions. The principles upon which such adjustments are made are supposed to be rooted in the soil of unalloyed justice. The means employed in the performance of the work of the machine (designated as a court) in reaching its conclusions (designated as judgments) are prescribed by the laws of the sovereignty. Sometimes—possibly, in constitutional provisions, sometimes by the legislature through the enactment of practice statutes, and sometimes through rules of court; but none of which essentially bear upon the question before us, since it (question before us) relates to the power and authority of the court (by any prescribed rules of practice) to entertain and determine *at all* the investigation involved in this proceeding. We have stated that the governmental machine called a court occupies two stat-

uses,—one as an inactive machine, and the other as an active one. Under its organization it is presided over and managed and conducted exclusively by an officer or officers called a "judge" or "judges." It is his, or their, duty to keep it in repair and effective working order (mechanical supervision) so that it may accomplish its work when it becomes active (functioning) in the prescribed field for its operation and within the limitations imposed and described as its "jurisdiction." The same managing officer or officers (judge or judges) operate and direct it when active, and when so engaged they are clearly exercising "jurisdiction," as is contemplated in section 110 supra, of our Constitution. But, whether they are likewise exercising "jurisdiction" as contemplated by that section, when they attempt to and do make repairs to the machine so as to preserve its ability to administer justice according to the forms of law when active, is another question and which is the one raised by reason (x) of ground (1), supra.

The distinction we have attempted to point out between the governmental machine called a court when inactive, and the same machine when in operation and performing the work for which it was created, may be more readily comprehended by a comparison between it and a material and inanimate mechanical machine designed for the accomplishment of a particular purpose. One possible difference between the two is, that the one (court machine) is always under the supreme management, custody and control of the same maintainer and operator, which, as we have said, is a judge or judges; whilst the other when not functioning may be and frequently is under the control and management of one vested exclusively with power and authority to watch after its maintenance and preservation, whilst another may direct its operation when actively engaged in the purpose for which it was manufactured. But such distinction is entirely immaterial for the purposes of our illustration. The power and authority to look after and maintain the mechanical machine in a perfect condition by remedying any defect that might arise in or to any of its parts, so that it might properly function when put in operation, is clearly the exercise of a different power and authority than is done by the one who actually directs, operates, and controls the machine after it has been so maintained and preserved. The latter would violate his authority as operator and exceed the limits

of the field of operation of his machine if he should undertake to thresh wheat with a sewing machine, or to sew with a wheat thresher. The reason is, that in doing so he would transcend the purpose for which his machine was created by embarking in undertakings beyond its power to perform, and in excess of its "jurisdiction" —so to speak—as would also be true of the operator of a court machine when he undertakes to employ it outside of the limits of its prescribed field.

Carrying the analogy further—the defects in the component parts of a mechanical machine may be detected by mere inspection by the mechanic whose duty it is to keep it in repair. But that information, generally speaking, may not be obtained in that manner by the mechanical maintainer of the governmental or judicial machine, since the defect in its parts, necessitating repair and correction, is not always disclosed by inspection nor communicated to the maintainer (the judge or judges) through any of the five senses. On the contrary, it is necessary in order to reveal the defects that an investigation be made, which involves the hearing of testimony upon an inquiry inaugurated for the purpose of detecting whether or not the machine or any of its parts need repairing. Hence, the inauguration of the instant one in order to discover the existence or non-existence of defective parts as charged by the relator. It is at this point, wherein, as we conclude, learned counsel for respondent errs in assuming that the inquiry, for the purposes stated, is an action at law or court proceeding that section 110 of the Constitution forbids this court to entertain by original proceedings.

That attorneys, or members of the bar, are assistants to and parts of the governmental court machine, is admitted by learned counsel and is universally declared to be true by all text-writers and courts. So much so that it would be an unnecessary consummation of space to list them. Their positions as such are not held by inherent right. They are entitled to become such only when they possess prescribed educational and moral qualifications. The law intends that they should continue thereafter to maintain them, and especially must they preserve their moral qualifications. If impairment thereto, or total loss thereof, is permitted to occur, then the judicial or governmental machine becomes impaired and inefficient to that extent and a con-

dition is created when its maintainer should in the exercise of his power and authority—as well as his duty—make the necessary corrections. What may be necessary to be done in the performance of that task depends upon the extent of the defect. The facts might develop a situation where it would only be necessary to oil the machine by administering a reprimand to the accused member, or it may be necessary, in order to restore the defective part of the machine, to administer a limited suspension of him, or the defect may be so aggravated as to require the entire removal of the defective part, which is accomplished by absolute disbarment.

Sustaining what we have said concerning the power and authority of courts to discipline members of the bar, as well as furnishing the reason therefor, is the text in 6 C. J. 580, in secs. 36 and 37. The first section states the universally accepted rule to be that "the right to practice law is not an absolute right, but a privilege only (citing many cases among which is Commonwealth v. Richie, 114 Ky. 366, 70 S. W. 1054, 24 Ky. Law Rep. 1218) which may be revoked whenever the holder's misconduct makes him unfit to exercise the duties of his office." In note 52 to the latter part of the excerpt cases are cited from practically every court in our federal government, and from other Anglo-Saxon speaking countries. The domestic cases in that list are Rice v. Commonwealth, 18 B. Mon. 472; Baker v. Commonwealth, 10 Bush, 592; Underwood v. Commonwealth, 105 S. W. 151, 32 Ky. L. R. 32; and Commonwealth v. Roe, 129 Ky. 650, 112 S. W. 683, 19 L. R. A. (N. S.) 413. Later ones are Lenihan v. Commonwealth, 165 Ky. 93, 176 S. W. 948, L. R. A. 1917B, 1132; Chreste v. Commonwealth, 171 Ky. 77, 186 S. W. 919, Ann. Cas. 1918E, 122; Capps v. Gore, 231 Ky. 185, 21 S. W. (2d) 266; and Commonwealth ex rel. Pike County Bar Association v. Stump, 247 Ky. 589, 57 S. W. (2d) 524. There are many others of like tenor, in some of which, particularly the Stump case, the right to a trial by jury in such an inquiry is denied, and which is one of the arguments put forth against our entertaining the instant investigation.

By section 109 of our Constitution judicial power in this commonwealth "both as to matters of law and equity, shall be vested in the senate when sitting as a court of impeachment, and one supreme court [to be styled the Court of Appeals] and the courts established

by this constitution." The "judicial power" therein referred to relates "to matters of law and equity," which we are most thoroughly convinced refers exclusively to and embraces only what is universally understood and designated as "adversary" litigation. It is the latter character of investigations that furnish the grist for the judicial mill when it is actively functioning as a court, and the right to so employ the court is the character of "jurisdiction" referred to in section 110 of our Constitution. As applicable to this court it is therein prescribed that it has "appellate jurisdiction," only to review by appeal such adverse litigation after originating in the properly prescribed inferior court. The word "jurisdiction" as so appearing in that section of our fundamental law was, as we are convinced, never intended to embrace an inquiry of the kind and character now under consideration, and which we have hereinbefore endeavored to describe. On the contrary, the right of the court to make them is necessarily inherent and its exercise is frequently referred to as "inherent jurisdiction." It so necessarily adheres as incidental to the preservation of the continued existence of the court, and its prestige, dignity, and respect—each and all of which would become destroyed because of the impotency of the court to act if such power and authority did not exist, and which is especially emphasized in our opinion in the Capps Case supra.

A most convincing argument sustaining our conclusion with reference to this reason of ground (1) is found in volume XXI, page 635, of the American Bar Association Journal, No. 10, published in October, 1935, prepared by Hon. Henry M. Dowling on the subject of "The Inherent Power of the Judiciary." Its insertion herein would unnecessarily lengthen the opinion, but to do so would no doubt strengthen it. The arguments therein advanced are completely in accord with what we have hereinbefore employed and they are sustained by note citations of many cases from every Supreme Court in the country. Its careful perusal and thorough study is recommended. Having so concluded, other arguments of learned counsel, such as the right to a jury trial, and a number of others, fall to the ground because they are based upon counsels' viewpoint that this hearing involves judicial power and authority as contemplated in section 110 of our Constitution, but which we have concluded is untrue.

But it is further argued that, conceding the correctness of our conclusion, then this particular investigation can discipline respondent only as an enrolled member of the bar entitled to practice before this court, and cannot molest his right to exercise the privileges of his profession in all inferior courts. But that view is essentially narrow and especially so when, as now, the privilege or license to practice law in any court of the commonwealth is granted in this jurisdiction only by the Court of Appeals. See chapter 131, p. 559, Session Acts of 1918, as amended and now appearing as a part of chapter 8 of Baldwin's 1936 Revision of Carroll's Kentucky Statutes (section 98a-1 et seq.). The validity of that act has been impliedly upheld in a number of cases, one of the latest of which is Commonwealth v. Defever, 241 Ky. 834, 43 S. W. (2d) 489. The exclusive method therein provided for is also adopted and approved in many other states of the Union. The enactment of that statute providing for admission to the bar superseded all others but did not change or alter the relationship of members of the bar throughout the state to the Court of Appeals, and it would be an anomaly if the creator could not discipline and regulate its creatures. More extended elaboration might serve to substantiate more convincingly our above-declared conclusions, but we deem it unnecessary to do so.

Reference is made in briefs of learned counsel to limits imposed by law upon the right of courts to deal with and punish contemnors, and it is sought to apply the reasons for such limitations to the present inquiry The situations possess no parallel qualities. The contemnor is most generally a layman possessing no right to practice law. His offense consists in assaults upon the dignity of the court or in committing obstructive acts to its free and unmolested operation. It involves elements approaching criminality and in its more aggravated form it is referred to as "obstructing justice," which is punished in many jurisdictions as a felony. Since the correction administered to those guilty of contempt may be corporal, the law has limited the extent of the punishment that may be inflicted by the presiding officer of the court without formal charges and a trial by jury. It will, therefore, be seen that the law and the practice applicable to contemnors can have no bearing in this case. It, therefore, follows that the objection

embodied in reason (x) of ground (1) should be, and it is, denied.

As we have seen, reason (y), supra, attacks our authority to make the rules that we have promulgated pursuant to the directions contained in the Bar Association Act, supra (chapter 3 of the Acts of 1934). The grounds are, that the legislative department of this commonwealth under sections 27 and 28 of the Constitution is the exclusive agency of the government that may so prescribe, and that it cannot delegate that authority to the courts which is expressly prohibited by section 28 of the instrument. But that argument proceeds upon the theory that the questioned rules appertain to a matter exclusively legislative, and which ignores entirely the conclusion that we have above announced in disposing of reason (x), supra. To follow counsels' contention to its logical conclusion would result in an absolute denial of any inherent power whatever in courts to prescribe and adopt any method of procedure in conducting inquiries of the nature here involved in order to discover whether or not any of the parts of its machinery has become in anywise contaminated. Therefore, if the Legislature should for any cause fail to do so, the court would be paralyzed and helpless to remedy its threatened destruction. Surely our laws are not so framed, nor former interpretations thereof so made as to make possible any such condition. On the contrary, what we have already said—supported by the cited authorities—answers this reason adversely to counsels' contention as will be seen by consulting those cases and authorities, particularly the Capps Case and those cited therein. Others to the same effect, repudiating this and other arguments urged against our authority to entertain this inquiry, are: Ex parte Wall, 107 U. S. 265, 2 S. Ct. 569, 27 L. Ed. 552; Ex parte Thompson, 228 Ala. 113, 152 So. 229; State Board of Law Examiners v. Phelan, 43 Wyo. 481, 5 P. (2d) 263, 78 A. L. R. 1317; In re Richards, 333 Mo. 907, 63 S. W. (2d) 672; and our recent case of Commonwealth v. Porter, 242 Ky. 561, 46 S. W. (2d) 1096. All of them affirm (expressly or impliedly) the right of the courts, in such circumstances as it was exercised here, to make necessary and appropriate rules, independently of any legislation, and that, perhaps, it would not be obligatory on its part to follow any such attempted legislation in the enactment of rules of procedure in such investigations. But it is not necessary

for us at this time to take a position with reference thereto—it being only sufficient to say that the court proceeded to act under the authority that the legislature attempted to confer upon it by the 1934 statute, and in doing so no constitutional principle was violated. This reason (y), therefore, must also be declared as without merit, thereby denying in its entirety ground (1), and which brings us to a consideration of the merits of the case.

Ground (2), as we have said, questions the correctness of the Board's findings on only two of the many charges preferred against respondent by the relator. It declined to consider some of them because they were charged to have been committed more than five years before complaint was filed with the Board. Others not so remotely occurring were dismissed as not being sustained by the proof, while two of them were found to be sustained and upon that finding the Board made these recommendations: "1. That respondent be suspended from the practice of law for a period of six months, without forfeiture of his then unexpired term as Commonwealth's Attorney. 2. If any general suspension would vacate his office, then that he be suspended for six months from the practice of law other than his duties as Commonwealth's Attorney, provided such limited form of suspension will not forfeit his office. 3. If no form of suspension is possible without forfeiture of office, then that respondent be censured by order of the Board, such censure to be imposed in open Court at Paintsville, in the presence of any members of the Kentucky State Bar and officers of the Court who may be present, but excluding the public."

The two charges that the Board sustained will be referred to by the designations given them in the Board's report filed with this court, which are: "The W. J. Ward Indictment" and "The Hall, Gilliam and Dennison cases." The facts with reference to the Ward indictment, as proved by practically uncontradicted testimony are these: Ward was county attorney of Johnson county, and as such it was a part of his duties to prosecute all criminal charges brought before the county judge of his county. One Tackett was arrested on a warrant and brought before the county judge and, when his trial was called, both Ward and respondent were present, but Ward asked to be relieved of his duty

to prosecute Tackett and to be permitted to retire from the case, leaving the prosecution to be conducted by respondent as commonwealth's attorney of the judicial district. That was done, and the trial of Tackett proceeded without the assistance of Ward. Later Conley, the county judge, and respondent appeared before the grand jury of the county and Conley testified before it in the presence of the respondent that Ward refused to prosecute Tackett and, therefore, became guilty of neglect of, and refusing to perform, his official duty. But in giving his testimony before that tribunal Conley did not state Ward's reason therefor, but of which he and Harrington possessed knowledge at the time. It was— that Tackett was the then husband of the widow of Ward's deceased brother. Such relationship created no blood kinship between Ward and the defendant on trial, but he thought, and perhaps correctly, that the circumstances furnished a legal excuse for him to be relieved of the duty to prosecute, and especially so when respondent was then and there present and could and did perform it. Conley not only failed to disclose Ward's excuse for the failure to perform his official duty upon which the indictment against him was based, but respondent also failed to draw out that fact from Conley whom he examined before the grand jury according to the testimony. Ward's indictment, which was drawn by respondent in the circumstances outlined, was never tried, although he persistently clamored for a trial at each successive term of the circuit court. It was eventually dismissed and went off the docket without any investigation of the charges preferred in it. The record discloses quite a bitter feeling between Ward and respondent, and likewise between Ward and the county judge, Conley, and we cannot escape the conclusion, as did the Board, that "such conduct on the part of the Commonwealth's Attorney was not consistent with the professional good faith incumbent on him, both as an attorney and as a public officer." He must have known that the grand jury most probably would not have found the indictment against Ward if his excuse for the alleged violation of official duty had been placed before it, and which some of the members of the grand jury supported by their testimony. We therefore approve the Board's finding on this charge.

The other charge that the Board sustained, and which it designated as we have stated above, grew out

54

of these facts: Respondent entered into a contract with Hall, Gilliam, and Dennison, and a large number of others who held life and disability policies with various insurance companies, whereby he agreed to collect claimed total disability benefits for the policyholders and to receive compensation for his services on a contingent fee basis. The three named policyholders, and also some of the others, filed actions in the Johnson circuit court against their insurance companies to recover the total amount of their respective policies under the total disability clause contained in the policies. Each case was contested, but plaintiffs in the three cases mentioned succeeded in recovering judgments for the amount of disability claim adjudged to be due them at the time of the rendition of the judgment, with the further requirement that the defendant in the action should continue to pay the monthly disability amount until the entire sum named in the policy was exhausted, provided the total disability found to exist should continue that long. But, if the disability should cease before the total amount of the policy was consumed, then the insurer would have the right to manifest that fact and to have it judicially determined that it was no longer obligated to continue the payments. There was a dispute between respondent and his clients as to the terms of the contract employing him, in this respect—he insisted that his clients agreed to pay him a fee equal to 25 per cent. of any judgment that he might obtain against the insurance company issuing the policy; whilst they insisted that he was to receive a fee equal to 25 per cent. of what he collected on the claim made against the insurer. However, that point of difference is not material as will later appear.

When the company paid the aggregate amount of past-due monthly installments that the court in the cases adjudged were due and should be paid, respondent kept for himself his full fee of 25 per cent. of the full value of the policy, as though it had been collected or had been adjudged to be paid at all events. At the time of doing so he was necessarily aware of the fact that all future payments were contingent upon the continued disability of his clients who were mostly, if not entirely, illiterate laborers. Notwithstanding such handicaps, they objected to the amount of the retainer held by respondent out of the first payment by the insured; but he did not heed their objections and appropriated the amount of his full

fee under his interpretation of the contract and which was based upon the theory (even under his interpretaion) that the entire amount of the policy would eventually be paid. The Board, after an elaborate rehearsal of the testimony concerning this charge, said: ''Applying the measure of good faith required of an attorney in dealing with his own client, to whom he stands in a position of trust and with whom he is not dealing at arm's length, the respondent's dealings with Dennison [and the other clients as well] in this instance must be condemned. Your Committee are, therefore, of the opinion that, at least as to Dennison and Hall, the charge of misconduct in dealing with a client is sustained.'' We concur in that finding.

Perhaps the violations to which we have referred— the establishment of which we entertain no doubt— would ordinarily merit at least a suspension of respondent's right to practice law, but we are convinced that such a corrective penalty would also suspend his right to continue to exercise the functions and to perform the duties of his office of commonwealth's attorney of his judicial district. That consequence would not only affect him, but it would likewise deprive the people of his district to have the one perform those duties whom they had selected for that purpose. Everything considered, we have concluded that the mildest corrective remedy to apply would be—that respondent be censured for the violations of which he is found guilty.

It is, therefore, ordered that respondent present himself to this court in its courtroom in the capitol at Frankfort, Ky., at 11 a. m. on a day to be hereinafter designated, and of which respondent will be duly notified, and that the trial committee who investigated the charges against him, Honorables Robert T. Caldwell and James Park, also be present; at which time the censure herein ordered will be pronounced. The recommendation for the allowance of an attorney's fee to the firm of Waugh & Howerton, of Ashland, Ky., will be heard and disposed of at that time, and until then this investigation is continued.

The whole court sitting.