## Louisville Bar Association v. Clarke.
(Decided June 11, 1937.)

B. M. VINCENT, Attorney General, for complainant.
DUDLEY L. CLARKE, pro se.

OPINION OF THE COURT BY CHIEF JUSTICE RATLIFF—
Confirming disbarment report of Louisville Bar Association.

This proceeding was originally filed in the Jefferson circuit court in December, 1935, by the Louisville Bar Association to disbar, suspend, or otherwise discipline respondent, Dudley L. Clarke, a member of the Kentucky Bar, for unethical conduct in the practice of his profession. The nature of the charges, facts, and history of the case will be more fully hereinafter set out.

Respondent filed his responses to the charges, and after a voluminous amount of evidence was taken the Jefferson circuit court sustained the charges and entered judgment disbarring respondent from the practice of law in this state. Respondent prosecuted an appeal from that judgment to this court, and the judgment was reversed solely upon the ground that the judge of the circuit court should have sustained respondent's motion to vacate the bench. See, Clarke v. Com., 259 Ky. 572, 82 S. W. (2d) 823.

Upon a return of the case to the Jefferson circuit court, the attorneys representing the Bar Association not desiring to prosecute it further in the courts, on the 24th day of January, 1936, an order was entered in the Jefferson circuit court transferring the entire record of the case to the State Bar Association and dismissed the court proceedings without prejudice.

No new evidence was heard before the Board of Bar Commissioners, and by agreement the record of the lower court together with the transcript of all the evidence heard which was used upon the appeal of the case, was withdrawn from the office of the clerk of the Court of Appeals and the case was determined by the board upon that record. Upon a review of the record before the full Board of Commissioners of the Kentucky Bar Association held at Frankfort January 24, 1936, the board found that the evidence fully sustained the charges and recommended to the Court of Appeals that respondent, Dudley L. Clarke, be disbarred from the practice of law in this state, and filed the record with the cerk of this court on the 30th day of January, 1936.

Respondent filed motion to quash the rule issued against him and also filed special and general demurrers to the charges on the grounds.: (1) That the court has no jurisdiction over respondent or the subject-matter of the case; (2) chapter 3 of the Acts of 1934 (the act creating state-wide Bar Association) is invalid; and (3) the respondent would be deprived of his legal and con-

stitutional rights by virtue of the procedure. These matters have been determined by this court in the trial of previous similar cases and decided adversely to respondent's contentions, and we need not further discuss those questions. A reference to those cases is sufficient. See Commonwealth ex rel. Ward v. Harrington, 266 Ky. 41, 98 S. W. (2d) 53; Commonwealth ex rel. Buckingham et al. v. Ward, 267 Ky. 627, 103 S. W. (2d) 117; In re Sparks, 267 Ky. 93, 101 S. W. (2d) 194.

The only question to be determined by this court is whether the evidence is sufficient to sustain the charge and the recommendation of the Board of Bar Commissioners.

A summary of the facts as disclosed by the evidence, the conclusions of the Board of Bar Commissioners, and its reasons therefor, are set out in its report to this court as follows:

"Facts:

"The respondent, during the time referred to in the evidence, was practicing law in Louisville, with offices in the Kentucky Home Life Building. Associated with him in this office was a one Raymond C. Arny, a lawyer, and one N. T. Roberts, a notary public. There had also been connected with respondent for more than two years previous to these disclosures, one Robert W. Taylor, who had previously been connected with one Nat R. Davidson, a former resident of Louisville, who had practiced law there until he became involved in the same sort of trouble with which respondent is charged. Davidson, after his operations in this respect came to light, left this state. It is apparent that Taylor had been implicated with Davidson in withdrawals from the receiver's office, and there is a very strong presumption that respondent likewise knew of Davidson's operations and Taylor's connection therewith. However, the court refused to permit any evidence of respondent's connection with Davidson to be brought to light. Except a very strong presumption, there is no concrete proof of this fact in the record, except the avowals which we do not think can be properly considered.

"The receiver of the Jefferson circuit court had in his hands certain funds accrued from remnants of estates and other moneys due litigants in

certain cases which had been concluded, except for the payment of the funds due the litigants in these cases. Some of these cases were more than forty years old.

"Through some method not disclosed in the record, Taylor was able to secure a list of the parties to whom the funds in some of these cases belonged, together with the style and number of the action and the amount due each litigant. Soon after Davidson's very timely departure from this state, Taylor came to respondent with a list showing the names of parties to whom funds were payable in the hands of the receiver.

"Upon the information thus obtained, respondent withdrew from the receiver's office in fifty-five cases, about $2300.00. Of that number, four seem to have been regular, although solicited. Fifty-one of the withdrawals were on forged powers of attorney. The arrangement under which Taylor and Respondent operated, provided that they should divide fifty-fifty such commissions as were thus realized.

"Before the powers of attorney were produced to the receiver and the withdrawal made in any of these cases, respondent had prepared contracts to be signed by persons to whom these funds were due. Respondent then delivered these contracts to Taylor for the purpose of obtaining the signature of the person to whom the money was due. These contracts provided that in consideration of respondent disclosing to the client the source of certain funds, respondent should receive as his fee a sum equal to fifty per cent. of such sums as might be collected by respondent.

"After the contracts were signed, the alleged clients were then procured in the same manner to sign and acknowledge powers of attorney, authorizing respondent as attorney for such parties to withdraw the funds due them. The respondent then took these powers of attorney to the receiver. The receiver then gave to respondent a check for the amount due the party whose name was signed to the power of attorney. The powers of attorney were then filed by the receiver and are now a part of his records. The check was made out to the

party for whom respondent was acting and respondent then signed a receipt by signing the name of his purported client, by 'Dudley L. Clarke, Attorney.' This receipt was made on the stub of the check and is also a part of the records of the receiver's office. These checks were then turned over, so respondent says, to Taylor and Taylor would within a short time return with the check with the name of the person to whom the check was made payable, endorsed on the check. These checks were cashed in various banks in Louisville. Some were endorsed by respondent and others by Taylor, or N. T. Roberts, the notary public in respondent's office. Respondent also prepared receipts for his alleged clients to sign. The purported signatures were obtained to the receipts as those to the contracts and powers of attorney. These receipts were returned to him by Taylor, some of which purported to have been witnessed by other persons.

"Of the fifty odd clients which the respondent claimed to represent, all purported to have executed the powers of attorney in Louisville before local notaries, except two which purported to have been executed in Indiana. These notaries had local street addresses, yet respondent never undertook to contact any of them or any of the witnesses to the contracts or receipts. None of his purported clients ever came to his office or talked with him over the telephone. On no occasion did he ever see or talk with any of them. The respondent with ample time was never able to produce a single client of the fifty-five he claimed to have represented. Only one out of this number could be produced. This was one Edward Finn, introduced by the Commonwealth who testified that he never signed any of the papers; never knew either respondent or Taylor and had never received any money.

"It was shown by complainant that of the fifty-five clients respondent claimed to represent, eleven had died long before the funds were withdrawn or the time any of the papers were purported to have been signed or acknowledged. One of the purported clients, Charles Berle, had been dead since 1910. Another had been dead since 1912, and another since 1913. In one instance the receiver's receipt

showed the name of Nelson W. Proctor by Dudley L. Clarke, attorney. Supporting this withdrawal was a power of attorney to respondent purported to have been executed by Proctor, together with a canceled check, purporting to have been endorsed by Proctor. Proctor had been dead for more than six years prior to the withdrawal. He was a prominent Louisville resident and for more than twenty years had been connected with the Louisville & Nashville Railroad as a commerce attorney, and his sensational death by suicide in July, 1928, had been given wide publicity in the press. It was shown that many of the purported clients resided in distant states and some in foreign countries.

"Even the most casual lay observance reveals that of the fifty-five signatures on the power of attorney and on the canceled checks, twenty-two of the powers and twenty-two of the endorsements on the checks were in the same handwriting. The name of Robert W. Taylor appeared as an endorser on the checks twenty times. An examination by any layman would connect Taylor with the twenty-two forgeries. Taylor wrote in a distinctly characteristic hand and had a characteristic kink in the loop of the capital 'W' of his signature which he carried in all of these forgeries. The Taylor handwriting appearing on the check was the same handwriting that appeared on the power of attorney. An examination of the checks show that twenty-six have been endorsed by respondent, but that none of the fifty-five had been deposited in a bank. It was shown that N. T. Roberts, the stenographer in respondent's office, had taken the acknowledgment as notary public of fifteen of the powers of attorney, one of which was that of Nelson W. Proctor, before referred to herein. Roberts name also appeared as endorser on six of the checks.

"All of the checks were cashed either by Clarke or some one for him at his special instance and request. Respondent says that of the fifty per cent. which he was to receive under the contract, he retained half, Taylor receiving the other half. He would then, as he says, deliver the balance of the proceeds to Taylor for delivery to the purported client. However, no part of the proceeds ever reached any of the parties entitled thereto.

"Two handwriting experts introduced by complainant, a Mr. Van Antwerp and a Mr. Green, testified from a comparison of handwriting, that Taylor was guilty of the actual forgeries on twenty-two of the contracts, powers of attorney, receipts and endorsements, and that respondent himself was guilty of five of the forgeries. One handwriting expert introduced by respondent contradicted these two witnesses in so far as they connected the respondent with any of the actual forgeries. However, the testimony of the respondent's handwriting expert is not so impressive as that given by Mr. Van Antwerp and Mr. Green.

"Respondent denies any knowledge of these forgeries or that he had any knowledge of any irregularity attending these withdrawals until after the filing of the information, and undertakes to excuse himself, because, as he says, he placed too much confidence in Taylor. Taylor in turn undertakes to pass the buck to a man by the name of Sullivan, whom he later referred to as Gallagher, whom he says he dealt with. Gallagher, however, has never been located.

"It may be conceded that any lawyer might be imposed upon by unscrupulous persons in the course of his professional life, and the same thing might happen to him once or twice, but it is almost impossible to imagine that the same thing would happen to the same lawyer in the same character of cases, within such a short period of time in fifty odd instances.

"Taylor was not a lawyer and respondent had no right to rely on him. It was respondent's duty to find out for himself as to the legality or regularity of his employment in these cases. Had he looked at the papers in these cases, he would have seen the genuine signature of many of the litigants. He would have seen that many of them were non-residents of Kentucky proceeded against by constructive service. This examination would have likewise disclosed the names of the attorneys of record for such litigants. This examination, which a reputable attorney should have made, would have saved respondent and prevented a fraud on the court.

"Conclusion:

"From the mass of evidence and documentary proof one cannot well escape the conclusion that respondent not only was guilty of uttering the forged instruments upon which these funds were withdrawn, but that he had actual knowledge of the forgeries and all circumstances attending the procuring of the names to the various papers by which the withdrawals were effected.

"Although convinced of the respondent's actual knowledge of these transactions, we think his conduct cannot be more justified, had he had no actual knowledge of the forgeries.

"The forgeries were too apparent to be overlooked and any person of half intelligence associated with Taylor, as was the respondent, would have long ago determined that there was something wrong.

"Recommendation:

"Believing that respondent's conduct in these matters is without justification of any sort, and that by that conduct he has proved himself to be void of the necessary moral requisites of any attorney at law, we recommend his disbarment."

Then follows the finding of fact that the complaint is fully sustained and the award recommending the disbarment of respondent.

The foregoing report of the Board of Bar Commissioners states briefly but accurately the facts and circumstances disclosed by the evidence. Without giving time and space to a detailed statement of the evidence, it is sufficient to say that upon a careful examination of the record for ourselves we are constrained to the conclusion that the record sustains the finding of fact and the recommendation of the Board of Bar Commissioners. It is therefore ordered that the report of the board be confirmed and approved and adopted as the opinion of the court and that respondent, Dudley L. Clarke, be, and he hereby is, disbarred from the practice of law in this state.

The whole court sitting, except Justice Clay, who was absent.