## Kenton County Bar Ass'n et al. v. Murphy.

(Decided Jan. 11, 1938.)

(As Extended on Denial of Rehearing March 25, 1938.)

618

HUBERT MEREDITH, Attorney General, for complainants.
ORIE S. WARE and S. H. BROWN for respondent.

OPINION OF THE COURT BY CHIEF JUSTICE STITES—
Confirming report of Bar Commissioners.

This proceeding is before us on a report of the Board of Bar Commissioners finding the respondent, John T. Murphy, guilty of unprofessional conduct and recommending that he be disbarred from the further practice of law in this state. A number of charges were made, some of which were dismissed because the incidents out of which they arose occurred more than five years prior to the institution of this proceeding. Several of the charges were dismissed on their merits. The final report of the trial committee, in which the full board concurred, found respondent guilty on three separate counts. Since we have concluded that the findings upon the so-called Weber count alone require the confirmation of the award, it will not be necessary here to consider the others. A detailed statement of the facts giving rise to this charge is essential to an understanding of the case. Some of the facts constituting the background of the present investigation are set out in respondent's brief and we have drawn on his statement of them, as well as on the report of the trial committee, in an effort to paint the complete picture.

Madeline Van Dezande, a woman in her twenties and a native of Belgium, married a man by the name of Beals some years ago. Beals was killed in Detroit, leaving her a widow. Thereafter she became housekeeper in the home of Thomas W. Corby, a wealthy widower past 75 years of age, who lived in Detroit. Some time after Mrs. Beals took over her duties as housekeeper for Mr. Corby she married him, and shortly thereafter a child, Marie Therèse Corby, was born. A year or two after the marriage Mr. Corby brought suit and obtained a divorce from Mrs. Corby. She was paid the sum of $50,000 pursuant to an antenuptial con-

tract. She left Detroit and moved to Dayton, Ohio, where she married one Russell Morgan and where she was living at the time of the death of Mr. Corby in 1924.

Mr. Corby had no children by his first marriage, and his only heirs at law other than the infant Marie Therese, whose parentage was disputed, were the children of his brothers and sisters. These nieces and nephews secured the appointment of an administrator, and it was at this time that Mrs. Morgan employed the respondent, John T. Murphy, to press the claim of Marie Therese as heir to the entire estate. After considerable litigation a new administrator was appointed on motion of the Michigan guardian of Marie Therese, and in 1926 a compromise was effected through the payment of $150,000 to the nieces and nephews, and quitclaim deeds to the land owned by Mr. Corby were secured from them. Mr. and Mrs. Morgan at this time had taken up their residence in Kentucky. Mrs. Morgan was serving as guardian of her daughter in Detroit, and she and Mr. Morgan were joint guardians in Kentucky. The respondent and his associate were allowed the sum of $75,000 for their services and $25,000 for their expenses in connection with the estate up to this time. After the payment of state and federal taxes of about $150,000, the payment to the nephews and nieces of $150,000, to Detroit lawyers about $100,000, to Mr. and Mrs. Morgan for their services as guardians, $100,-000, and the payment of the expenses and fees of respondent and his associate, there still remained in the hands of the guardian an estate of something over $1,000,000. This terminated respondent's first employment.

In 1927 Mrs. Morgan again employed respondent, this time to procure a divorce for her from Mr. Morgan. Following this divorce, Morgan's guardianship was terminated, and thereafter Mrs. Morgan served as the sole guardian, both in Michigan and in Kentucky. Respondent served as her attorney. Some time thereafter Mrs. Morgan married one Weber, and it is from this fact that the charge here before us has been designated the Weber count. although during the time when most of the incidents here involved occurred she was still Mrs. Morgan.

During the year or two while Mr. and Mrs. Morgan

were acting as joint guardians, they had succeeded in getting their accounts into great confusion. Mrs. Morgan had procured from the Kenton county court an annual allowance of $36,000, for the maintenance of her ward, and Morgan himself had obtained from that court an allowance of $6,000 a year as a sort of manager of the estate. They were therefore enjoying an annual income of $42,000, out of their ward's property. They had moved to Cleveland, Ohio, where they evidently lived in some style. Respondent says that when he was re-employed in 1927, he found that they had kept no books of account and could produce only bankbooks and records which showed only the amounts deposited in bank and the amounts withdrawn therefrom. The estate consisted almost exclusively of valuable land in and about Detroit. The principal tract had been sold to a Detroit company for $1,073,000 under a contract which provided for payment out of the proceeds of sale of numerous lots into which the tract was divided. As said in the report of the trial commissioners:

"Detroit was the place where the money came in, and Kentucky was the place where the money went out."

By an order of the Kenton county court, entered upon affidavit and motion of respondent, the People's Bank & Trust Company of Covington was designated as the depository of guardianship funds in Kentucky, and those funds were made subject to the joint control of the guardian and the surety company on her bond.

Meanwhile, and even before the divorce, Morgan had been deposed as manager of the estate, the allowance of $500 a month had been cut off, and the office of the estate had been moved to respondent's office in Covington. Respondent was paid $200 a month for this service, and while the checks which covered his compensation in this capacity are marked for "legal fees" or "attorney's fees" or simply "fees," the trial commissioners found, and we think correctly, that respondent is right when he says that these payments were not intended to include compensation for all of his professional services during that time. He undoubtedly did a large amount of work between his second employment in 1927 and its termination in 1931.

The foregoing statement of facts furnishes simply

the background for the occurrences hereafter to be narrated.

Early in September, 1928, Mrs. Morgan went to Europe, where she remained for three months. Shortly after her departure, on September 14, 1928, respondent opened an account in the Lincoln National Bank at Cincinnati, in the name of "Madeline Corby Morgan, Special Guardian for Marie Therese Corby," and deposited therein a check of the Scripps-Jefferson Land Company of Detroit, in the sum of $20,915.66. (The exact amount of the check is material). The check was made payable to Mrs. Morgan as special guardian for Marie Therese. Neither the respondent nor the guardian had ever had a deposit in this bank before. Respondent himself says that the account was opened:

"So that I could use the money to take care of not only myself but other expenses while she was away and if it was there it would not be necessary to have the signature of the bonding company in Kentucky. * * * By depositing them over there it would not be necessary to have any bonding company O. K. them."

Before going to the bank, respondent indorsed this check for deposit to the credit of Madeline Corby Morgan, special guardian for Marie Therese Corby. The check was deposited and sent through the usual channels for collection. At the time of making the deposit, respondent was given a signature card and asked to return it with the guardian's signature. Respondent took this card with him and some time later returned it to the bank with the signature "Madeline Corby Morgan" written thereon in his own hand. When the check for $20,915.66 reached Detroit, the bank there refused to honor it because of some defect in the indorsement, and it was returned. Respondent again indorsed it, but it was again returned, and he finally was compelled to send it to Mrs. Morgan in Europe. She indorsed it and returned it to him, and it then went through and was collected. Respondent testified that he did not tell Mrs. Morgan in what bank he was making this deposit. Thereafter respondent made other deposits in this account, all the property of the estate of Marie Therese, and the checks were indorsed by him with the name of Madeline Corby Morgan, bringing the entire amount deposited to $50,192.77. Some of the deposits were

made in this manner even after Mrs. Morgan had returned from Europe. Respondent withdrew all of this money from the Lincoln National Bank by checks which he signed with the guardian's name as he had written it on the signature card. He admits that most of this money he used for his own purposes, although he had made an estimate of traveling expenses and other disbursements by him in connection with the guardian's business for which he says he was reimbursed in this way. He estimates these items at about $13,000. He says:

> "Well, I carried on this litigation, and I paid out this money that I have shown, and I have lived on it, and carried on this litigation."

Asked on cross-examination why he did not have the guardian sign the checks for withdrawals from this deposit, he says:

> "Well, the first proposition, it wasn't her account in the Lincoln National Bank; that was the account I put in there myself, it was my account."

In a suit subsequently filed against the Lincoln National Bank concerning these transactions, and which will be referred to hereafter, respondent was cross-examined concerning the letter which he wrote to Mrs. Morgan sending the $20,915.66 check for her indorsement. The letter is not a part of the record before us, but the following sentence taken from it was read to respondent in the course of his examination:

> "The bank even credited the endorsement so it could be put to your credit and drawing interest while you were away."

This is hardly consistent with respondent's assertion that the account was his own.

In February, 1929, respondent says that Mrs. Morgan, who had bought her peace with Morgan in the divorce proceeding by paying him $20,000, was in need of funds, and came to Covington to get some money. He says that he "gave her $20,000," that is to say, he deposited that amount in her guardian's account in the Covington bank. Respondent says concerning this transaction:

> "I discussed it with her and gave her the money. She was present with me when we put it in the

bank, and I went to the Court House—not to the Court House—but she got her check on the same day for something over $20,000, for herself as guardian for the maintenance of the child and she wanted it right at that time. She knew that I had the $20,000 because she came back from Europe—she knew that I had it, and we discussed it all the time, and up until February when I knew that there were other collections coming in."

It will be observed that Mrs. Morgan knew from the fact of having indorsed the check that there was $20,915.66 somewhere which belonged in the guardian account. It is singular, to say the least, that the amount which respondent deposited in the Covington bank as a result of her demand for cash was $20,915.66, the exact amount to the cent of the check deposited by him in the Lincoln National Bank after it had been sent to Europe for the indorsement of the guardian. Respondent was asked about this on cross-examination. The answer was:

"That is what we agreed to so that the account in the bank, at the Peoples Liberty Bank—she was there that day, had been in my office several times, and it was when we were making up our account with the Kenton County Court. * * * It was solely a matter of bookkeeping. She had that much due her, a little over $20,000, and it was just a matter of bookkeeping; we wanted it that way."

Upon the question being repeated, he answered:

"The reason was this: She came back from Europe and she had spent $20,000; she had given Morgan $20,000, her husband, and she was out of money, that is, she wanted her allowance, and I was getting in this money from Frye and she needed it, and I had it, and I just said it was all right, I would just put that over into the account and then she could draw her $20,000 allowance."

Respondent nowhere undertakes to justify the procedure in finessing the surety on the guardian's bond through his scheme of making deposits in the Cincinnati bank, where the surety's countersignature was unnecessary, but he asserts that the account was carried with the knowledge and consent of the guardian. This may be true to the extent of the $20,915.66 check, but the

circumstance that this was the exact amount paid to the guardian on her demand indicates very strongly that she was not at that time advised of the other amounts placed in the Cincinnati bank. Even if Mrs. Morgan knew all the circumstances, it is obvious that respondent deliberately opened the account and used it as a means for avoiding the supervision of the surety company whose countersignature was required on all of the guardian's checks deposited in her regular account.

Subsequent to the transaction in regard to the check for $20,915.66, Mrs. Morgan seems to have discovered the fact of the additional deposits made by respondent in the Lincoln National Bank. She employed a reputable firm of lawyers in Cincinnati to investigate the matter for her and told them of the deposits and withdrawals by respondent. In February, 1931, respondent was interviewed by one of the members of the Cincinnati firm and subsequently by another. It is inconceivable that either of these gentlemen would or could color their testimony or that either of them has any interest in the matter before us other than to maintain the integrity of the bar. Both of them testified that respondent told them that he opened the Lincoln National Bank account, made the deposits, and withdrew the money without authority from Mrs. Morgan and without her knowledge, and that "if she demanded the money, it was up to him to get it for her." Respondent was asked why he had done this, and he said that Mrs. Morgan was only getting 4 per cent. interest in the Covington bank. He was reminded that the account in the Lincoln National Bank was a checking account and paid no interest, and he then said that he, respondent, was going to pay her 6 per cent. interest and that "he would have the money next Friday or the next week after that, and that he had the money invested in some securities." Respondent denies the version of the interview given by the Cincinnati lawyers and categorically denies certain of the statements which they attribute to him, including the statement that the deposit in the Lincoln National Bank was made without the knowledge or authority of Mrs. Morgan. Brushing aside all questions of the relative credibility of respondent and these witnesses, we are still confronted by the circumstance that the check which respondent gave Mrs. Morgan upon her return from Europe was in the exact amount of the

check which she unquestionably knew he had received. If, as respondent says, it was agreed that he would be permitted to use the proceeds of this check for his own expenses, it is odd that the two amounts would tally to a cent. On the other hand, if Mrs. Morgan was advised of other deposits made or to be made in the Lincoln National Bank account, it seems strange that she would not have agreed to maintain a balance in that account if no other checks had then been received, or, if at that time additional checks had been received, it seems inexplicable that she would not have demanded more than the exact amount of the original deposit. Such behavior would hardly be in character with her previous actions.

When respondent failed to return to the estate the amounts deposited in the Lincoln National Bank over and above the check for $20,915.66, Mrs. Morgan, through her Cincinnati attorneys, filed suit against the bank in the common pleas court of Hamilton county, Ohio, and recovered a judgment for something over $30,000. The case was appealed and was affirmed by the Court of Appeals for Hamilton county. Lincoln National Bank v. Morgan, 46 Ohio App. 9, 187 N. E. 646, 648. In the course of its opinion the appellate court said:

"All of this money, with the exception of a few dollars, was drawn out by Murphy, upon the forged signature of the guardian, conforming to such signature forged upon the signature card."

In March, 1931, while the suit against the Lincoln National Bank was still pending, respondent brought suit in the Kenton circuit court, against Mrs. Morgan as guardian, for $150,000, which he claimed for services and expenses. This suit was settled in May, 1935, by the payment of $2,500 by the guardian to the respondent. Respondent insists that this circumstance exonerates him, since it indicates that the guardian owed him more than the amount of his net withdrawals from the estate and that it was in effect a recovery by him of approximately $32,500 as compensation for expenses and services when the $30,000 which he had already received through withdrawals from the Lincoln National Bank is counted in. It will be observed, however, that the guardian, by the time this settlement was made, had already recovered the $30,000 from the bank, and it was apparently immaterial, so far as she was concerned,

whether the bank should ever be able to reimburse itself from respondent. The net result of the transaction was to settle respondent's alleged claim of $150,-000, for $2,500, and to leave him indebted to the bank for something over $30,000. We agree with the conclusion as expressed by the Board of Bar Commissioners:

> "Undoubtedly the affairs of this guardianship were managed with great looseness. Everybody concerned seemed to be in the mood to milk this estate for their own advantage and, in this respect, Mrs. Morgan's conduct was hardly better than Murphy's. We think no complaint can be made of Murphy's endorsement on the checks which he deposited in the Lincoln National Bank. They were merely endorsed for credit to the account of the guardian and no one can complain of having money put in bank to his credit. The signature card and the checks drawn on this deposit are very different matters. They were the means of withdrawing guardianship funds and Murphy himself says, in effect, that he used them for any purpose that suited him. It is true that he says that Mrs. Morgan knew about this, but we think the evidence shows that she did not know of it and that Murphy intended to conceal it from her. Certainly, the method of handling these remittances from Detroit was a departure from recognized standards of professional conduct."

Respondent stands convicted on his own testimony of conceiving and putting into execution a scheme calculated to defraud the surety on the guardian's bond. He stands similarly convicted of using the estate of an infant coming into his hands for his individual purposes, and he has actually permitted himself to be the instrument and beneficiary of a stratagem whereby the Lincoln National Bank of Cincinnati was forced to repay more than $30,000 to the ward's estate, which respondent had pocketed. Throughout the entire record respondent seems totally unable to appreciate the fact that he was dealing with trust funds. Indeed, he seems continually to assume that the mere connivance of the guardian is a defense for his action. Obviously, the collusion with the guardian, assuming it existed, can furnish no basis, either legal or moral, for the mulcting of the estate or for the fraud committed on the bank.

The original *confessed* design to circumvent the surety on the bond of the guardian through the medium of the Cincinnati bank account furnishes a touchstone by which the other evidence, in so far as it is disputed, may be tested and solved. When pieced together, the circumstances become overwhelming. Respondent has overlooked the fact that it was the estate of the ward that was paying his fees and that he was representing. He seems to have operated under the impression that his single duty was to the guardian whether her interests were antagonistic to the ward or not and that the estate might be wasted with impunity so long as the guardian made no objection or joined in the debacle. This is substantially the only defense offered for his conduct.

Respondent stands indicted in Ohio for uttering forged instruments in connection with withdrawals from the Lincoln National Bank. He has never been tried on these charges and has continually fought extradition. He likewise is charged here with various other professional offenses, and, as pointed out above, stands convicted upon two of them in addition to the so-called Weber count. We do not feel called upon to consider all of these matters. It is sufficient merely to recite the history of respondent's conduct under the Weber count to demonstrate that he is lacking in the fundamentals of integrity necessary to an attorney at law. Thornton on Attorneys at Law, vol. 2, sec. 804 et seq.

Respondent again attacks the constitutionality of the right of this court to try him. These questions have been settled in the cases of Com. ex rel. Ward v. Harrington, 266 Ky. 41, 98 S. W. (2d) 53, and In re Sparks, 267 Ky. 93, 101 S. W. (2d) 194. See, also, Com. ex rel. Buckingham v. Ward, 267 Ky. 627, 103 S. W. (2d) 117; Louisville Bar Association v. Clarke, 270 Ky. 315, 109 S. W. (2d) 619; Louisville Bar Association v. Yonts, 270 Ky. 503, 109 S. W. (2d) 1186.

Respondent insists that he has been deprived of his property without due process of law and denied the equal protection of the law under the Fourteenth Amendment. He advances no argument not already answered adversely by one or more of the cases above cited, but he relies very heavily upon the recent decision of In re Noell, 8 Cir. 93 F. (2d) 5, 6. In that case the Eighth Circuit Court of Appeals declined to recognize

628

the extrajurisdictional effect of a judgment of a Missouri state court suspending an attorney. The basis for the decision was that the attorney was suspended upon the mere recommendation of a commissioner who heard evidence and made findings without an opportunity for argument or hearing *before the court* even though due exceptions were filed to the commissioner's report. The court based its decision primarily on the following quotation taken from a syllabus to Windsor v. McVeigh, 93 U. S. 274, 277, 23 L. Ed. 914:

"A sentence of a court pronounced against a party without hearing him, or giving him an opportunity to be heard, is not a judicial determination of his rights, and is not entitled to respect in any other tribunal."

Granting to respondent, for purposes of argument, all that the Noell decision holds or that he contends it holds, it can still be of no comfort to him. He has here had both the opportunity to be heard and a hearing—a very careful and sympathetic one. He has been represented by counsel and has presented every defense that was available to him, not only before the trial commissioners and the full board of Bar Commissioners, but also before this court. The sentence imposed upon him, while recommended by the commissioners, represents the independent judgment of the court after hearing and on the proof presented. The court feels the heavy responsibility it must bear in cases of this nature, and its action is its own—not that of the commissioners.

It is ordered that the report of the Board of Bar Commissioners be and it is hereby confirmed, and that the respondent, John T. Murphy, be and he is hereby disbarred from the further practice of law in this commonwealth.

Whole court sitting, except Rees, J.