## In re Hargis.

Oct. 2, 1945.

Opinion of the Court by Judge Cammack—Disbarring respondent.

Following a hearing before Commissioners Gavin Cochran and Edward A. Dodd, the Board of Bar Commissioners ruled that Wm. G. Hargis, a member of the Kenton County Bar, be permanently disbarred from the practice of law in Kentucky, and that his name be stricken from the roster of the members of the Kentucky State Bar Association. The respondent, Hargis, was found to be guilty of unprofessional conduct in filing and prosecuting a divorce action in the Kenton Circuit Court on behalf of a nonresident after he had been informed that she was not a resident of Kentucky. Hargis objected to the manner in which the proceeding was conducted at the outset, and has raised the same question before us. Permission was granted him by this Court

to file additional proof. The additional proof, however, adds little, if anything, new to the action. The case of Commonwealth ex rel. Ward v. Harrington, 266 Ky. 41, 98 S. W. 2d 53, disposes of the question relating to the nature of the proceeding. After a careful examination of the record we have reached the conclusion that the finding of the Board of Bar Commissioners should be confirmed.

Mrs. Gindy, for whom Hargis obtained a divorce, her sister, Mrs. Bradley, and a man by the name of Radel testified against the respondent. Mrs. Flonnie Cox and Mr. and Mrs. Lawson were the principal witnesses for the respondent, in addition to himself. The evidence against the respondent was to the effect that he knew Mrs. Gindy was a resident of Ohio at the time he filed the divorce action for her. The evidence in his behalf was to the effect that he did not know she was a nonresident until after the hearing (but before judgment) in the Kenton Circuit Court. The report of the Trial Committee contains a very careful analysis of all the evidence produced at the hearing. Because of the seriousness of the penalty imposed upon the respondent, we have decided to quote at length from that report and adopt it as our opinion:

"On February 25, 1944, respondent himself testified by deposition, although the deposition which he had previously given before the Investigating Committee had been filed as a part of the record at the hearing on December 15th. He testifies that when Mrs. Gindy first came to his office on November 30, 1942, she told him that she lived at 121 E. Sixth Street, Covington, and that she had lived there since August, 1941. Respondent says that he had no reason to doubt her statement, and on the strength of his belief in its truth he drew up a divorce petition which Mrs. Gindy signed and swore to. No mention was made, the respondent says, of Mrs. Cox, or of using Mrs. Cox as a witness in Mrs. Gindy's divorce case.

"The respondent substantiates, of course, the testimony of Mr. and Mrs. Lawson that they were in his office on the morning of November 21, 1942, the day the Gindy divorce case was set for hearing, and that the Lawsons went into a back room when Mrs. Gindy and Mrs. Bradley came into the office. He says that Radel,

contrary to the latter's assertion, did not come into the office that morning with Mrs. Gindy and Mrs. Bradley, but came in later, and after the conversation related by the Lawsons had taken place. Mrs. Bradley, the respondent says, asked what he wanted her to say, that he replied, 'whatever you say let it be the truth, anything else is perjury.' The respondent, Mrs. Gindy, Mrs. Bradley and perhaps Radel (the respondent not being sure whether the latter accompanied them or not) then went to the Court House, and Mrs. Gindy and Mrs. Bradley 'were sworn and testified to the same thing they told me. The story they told Judge Goodenough on the witness stand was the identical story they had told me. I did not know and had no idea that they were from Cincinnati until after the trial.'

"After the respondent had completed his own testimony, he filed with his deposition, over complainant's objection, fourteen exhibits. Probably most of these exhibits are technically incompetent or of no probative value, because their purpose is simply to impeach complainant's chief witness, Mrs. Gindy, and in most instances they relate to the character or criminal record of persons other than Mrs. Gindy herself. Indeed, there is no direct evidence that the 'Helen H. Bradley' and the 'Helen (Bradley) Jones' referred to in most of the exhibits are the same person as Helen B. Gindy. The complainant's objection to the filing of most of these exhibits should probably be sustained. However, the Trial Committee is of the opinion that the interests of justice can best be subserved by overruling the complainant's objections and permitting all of the fourteen exhibits offered by respondent to be filed and considered for whatever they may be worth.

"These exhibits show, if they show anything, that a man who was presumably Mrs. Gindy's first husband was convicted of a felony; that she herself (if indeed it is she to whom the exhibits refer) in 1927 was adjudged in Ohio to be a juvenile delinquent; and once many years ago was referred to by the Cincinnati papers as a 'flapper bandit'; that the morals of her current husband, David Gindy, are conspicuous by their absence; and that one or more of Mrs. Gindy's children by Gindy may have been born before she and her husband found it convenient to solemnize a formal marriage.

And it is undisputed, of course, without the aid of the exhibits, that Mrs. Gindy and Catherine Bradley, both witnesses for complainant, were guilty of perjury in the Gindy divorce suit.

"So whether all or any of respondent's fourteen exhibits are technically competent or not, we think that we may take it as proven or admitted that the character of the complainant's principal witnesses is, to put it euphemistically, not beyond reproach.

"The issue as to whether or not, at the time he was first employed by Mrs. Gindy to obtain a divorce for her in Kentucky, respondent knew that she lived in Ohio and had never been a resident of Kentucky, presents simply a question of the veracity of the witnesses. If Mrs. Gindy, Mrs. Bradley and Radel are to be believed, the respondent knew all the facts from the beginning, and it was he and Mrs. Cox who suggested to Mrs. Gindy that she swear that she lived at 121 E. Sixth Street in Covington. If the respondent, Mrs. Cox, and Mr. and Mrs. Lawson are to be believed, then Mrs. Gindy herself contrived the story that she lived at the address just mentioned; the respondent was innocently taken in by his client, and he knew nothing of the true facts until after the divorce case had been formally submitted for judgment.

"In general, the veracity of witnesses is to be determined by

"(1) Their appearance on the stand, and their character insofar as their character bears upon the question of their probable willingness to lie;

"(2) The existence or non-existence of a motive for falsification; and

"(3) The collateral undisputed facts bearing upon the intrinsic probability of the truth or falsehood of the testimony given.

"The Trial Committee did not have the benefit of observing the appearance on the stand of any of the witnesses who testified, except the respondent and Mr. and Mrs. Lawson, since the other witnesses all testified by deposition. The character of respondent and his witnesses, so far as the record discloses, is unquestionably superior to that of the complainant's principal witness, Mrs. Gindy. No attack is made upon the character of

Mrs. Bradley, with the rather important exception that, to help her sister-in-law, she admittedly perjured herself at the divorce hearing. Nicholas K. Radel's character is in no wise called in question, unless it be by the fact that he admittedly 'had to do with liquor in some way' during prohibition, and by the rather clear inference in the record that his interest in Mrs. Gindy, a married woman, is something more than platonic.

"It seems to the Trial Committee that the respondent has considerably more motive for fabrication than do any of the witnesses for the complainant; and the motive of his friends, Mrs. Cox and the Lawsons, exists in a corresponding degree. If the facts stated by complainant's witnesses be true, then the preservation of respondent's professional life depends upon a successful fabrication by him and his witnesses. If the facts stated by respondent be true, it is difficult to see that complainant's witnesses have anything at all to gain by a fabrication. The mere fact that Mrs. Gindy's character and morals may not be of the highest order, does not, of course, mean that she can be expected to perjure herself for the mere joy of lying. Even a person of low character will ordinarily tell the truth unless he has something to gain by telling a lie. The record suggests no motive which would impel Mrs. Gindy or the complainant's other witnesses to fabricate their story, unless it be an intimation by respondent in his testimony that Mrs. Gindy has become angry at him (though no reason why she should have become angry is suggested), or unless it be that Mrs. Gindy and Mrs. Bradley, who are under indictment for perjury growing out of the Gindy divorce suit, hope for some leniency in that criminal prosecution as a result of their testimony in the present proceeding. Such hope, whether well founded or not, may be adequate to supply a motive for the falsification of their testimony by complainant's witnesses.

"The Trial Committee is aware that it is entirely possible for a lawyer, in all innocence, to be imposed upon by a client who does not tell him the truth. As Mr. Hargis suggests, it is perfectly possible that Mrs. Gindy, being anxious to obtain a divorce and knowing that she could not obtain one in Ohio, came to Kentucky and "shopped around" among other lawyers until she

had secured sufficient information to apprise her of the residence requirements requisite to a divorce in this state. She may then have come to the respondent and told him a perfectly plausible story which would naturally be calculated to convince him or any other lawyer that she was a bona fide resident of Kenton County. The respondent could then, entirely innocently, have prepared and prosecuted her divorce case, and be an unfortunate victim of his client's deceit.

"All this, as we say, could easily have happened, but the evidence concerning the collateral facts bearing upon the intrinsic probability of the truth or falsehood of the respective stories of complainant's and respondent's witnesses entirely convinces the Trial Committee that no such thing did in fact happen in the present case.

"It is indisputable that, of all the thousands of addresses in Kenton County that Mrs. Gindy might have used, she used, by her own or someone else's inspiration, the address of Mrs. Flonnie Cox at 121 E. Sixth Street, Covington. If, as Mrs. Cox says, she had never seen or heard of Mrs. Gindy, it is certainly an almost miraculous coincidence that Mrs. Gindy happened to pick out the address of this one woman, who was a friend and at least on occasions a client of the respondent, and an address next door to that where Mr. Hargis himself had lived. If Mrs. Gindy selected this address by pure chance, it is remarkable, too, that when she told the respondent her address he did not remark upon the coincidence that his new client, whom he had never known before and who just happened to come to his office, lived right next door to where he himself had lived, and in the same house where his former next door neighbor, Mrs. Cox, still resided.

"If Mrs. Gindy's testimony be a pure fabrication, it is passing strange that Mrs. Livingood (Mrs. Woolard), whom Mrs. Gindy said referred her in the first place to Mrs. Cox, upon receipt of a letter from the Investigating Committee of the Kenton County Bar Association relative to the Gindy divorce case, should have called, of all the people in southern Ohio and northern Kentucky whom she knew, Mrs. Flonnie Cox, a casual acquaintance and a woman who had never seen or heard of Mrs. Gindy, and who had no interest in her case.

"From all the testimony in the record, it is entirely incredible that this whole affair did not arise in just the way Mrs. Gindy and Radel say it did. The testimony convinces the Trial Committee beyond reasonable doubt that Mrs. Gindy mentioned her failure to obtain a divorce in Ohio to a number of her friends, among them Mrs. Livingood, and that the latter suggested that if she would contact Mrs. Cox she might be able to obtain a divorce in Kentucky. It is clear from the testimony, we think, that Mrs. Gindy did then come to see Mrs. Cox; that Mrs. Cox told Mrs. Gindy that the latter might use Mrs. Cox's address as her own; that she (Mrs. Cox) would testify in the divorce case that Mrs. Gindy lived at that address; and that Mrs. Cox referred Mrs. Gindy to Mr. Hargis. The testimony convinces the Trial Committee that, once in Mr. Hargis' office, Mrs. Gindy told him that she lived in Ohio but wanted a Kentucky divorce; that she had been referred to him by Mrs. Cox, and had arranged with her to use Mrs. Cox's address as her own in Kentucky; and that the respondent, in full possession of the facts, fixed his fee on the basis of his knowledge that this was a 'hot' case.

"In his brief, respondent argues, in effect, that he is the victim of a conspiracy against him by the Kenton County Bar Association, and accuses that Association of attempting to 'frame him.' He states that this is not the first time that it has sought to do so. This mode of defense, by leveling an attack at the good faith of the prosecutor, is a defense which is almost invariably encountered in such cases as this. The Trial Committee feels that the Kenton County Bar Association is to be commended for its activity in this case. There is not a scintilla of evidence in the record that the Kenton County Bar Association or anyone representing it has done other than its duty, which, under circumstances such as these, is sometimes very difficult to do.

"In his brief, the respondent further accuses Judge Goodenough, by innuendo, if not directly, of joining in the conspiracy against the respondent by granting immunity to the two admitted perjurers, Mrs. Gindy and Mrs. Bradley, in consideration of their testifying against the respondent in this case. As proof of this, he cites the fact that both Mrs. Gindy and Mrs. Bradley have pleaded guilty to the charge of perjury over a year ago,

and yet to the date of the writing of respondent's brief neither has been sentenced by Judge Goodenough, and Judge Goodenough has not even required either of them, although nonresidents, to execute a bond for their appearance. As to why Judge Goodenough has not sentenced Mrs. Gindy and Mrs. Bradley, although they have pleaded guilty to the charge of perjury, this record discloses only the following:

"'Q. Judge those indictments charged Helen Gindy and Kathryn Bradley with false swearing in a divorce case, did they not? A. Yes.

"'Q. The one we referred to here? A. Yes. The indictments against Gindy and Bradley have been held up pending the outcome of the charge of the Bar Association against attorney, W. G. Hargis. The Court has never made up his mind what disposition he would make of these indictments.'

\* \* \* \* \*

"'My best belief is they already have entered pleas of guilty to these indictments. But in view of the record I believe there will be a plea of guilty, but I never to this day have made up my mind what to do with them.'

\* \* \* \* \*

"'And further answering Mr. Cushing's question I wanted these defendants indicted to show that the Court was not sitting in the chair of the persecutor trying to persecute attorney Hargis, and let these two confessed perjurers go free.'

\* \* \* \* \*

"'Q. They are not under bond, are they? A. No, I don't believe I put them under bond.

"'Q. And they were to appear at any time they were called upon, was that the understanding? A. They were to appear in my court at any time I wanted they to.'

"Returning to respondent's argument in his brief: Lastly he asserts, in effect that he was the victim of a general conspiracy by Mrs. Gindy, Mrs. Bradley and Nick Radel, 'to put one over on the Kentucky courts,' and on respondent himself. He argues that having been caught in their lie as to Mrs. Gindy's residence, they are attempting to lay their own perjury at the door of

the respondent. As far as this charge of a conspiracy on the part of the complainant's chief witnesses is concerned, and the assertion that the respondent is the innocent victim of their attempt to 'put something over' on him and on the Kentucky courts, we should like to refer, in addition to our previous discussion of the evidence on this point, to the uncontradicted testimony of the respondent himself.

"The respondent testifies that at the conclusions of the hearing before Judge Goodenough, he walked from the Court House back to his office a little bit ahead of Mrs. Gindy, Mrs. Bradley and Mr. Radel. This is the respondent's version of what happened next:

" 'I had Mr. and Mrs. Lawson waiting for me, but I had not much more than got inside until Mrs. Bradley and Mrs. Gindy came in. They had just about sat down when Mr. Radel came in. When he came in he seemed to be somewhat excited and he walked up to the desk and said "I believe they are next." I asked him "Next to what?" He said "Don't play dumb. You know these women are from Cincinnati." I said "If they are from Cincinnati get them and get the hell out of here and back to Cincinnati where they belong." With that they left.'

"Mr. and Mrs. Lawson testify to the same facts. Radel, though he denies the conversation in the exact form testified to by respondent and the Lawsons, does not differ very materially as to what occurred when they all returned to respondent's office following the hearing in the divorce case. Radel says, on cross-examination by respondent, that he probably did ask what Bill Wehrman, the County Attorney, was doing in the court room during the divorce hearing, but denies that he said 'I believe they are next * * * Don't play dumb. These women are from Cincinnati.' The next question asked Radel by respondent on cross-examination is whether respondent did not then tell Radel, 'If they are from Cincinnati, get them and get the hell back to Cincinnati. Radel's answer is:

" 'No, you did not tell me if they are from Cincinnati, get them back, because you already knew they were from Cincinnati. The best thing to do was to go back.'

"Whatever the exact form of the conversation may have been, the respondent admits, and no one denies, that on the very same day when the divorce hearing was completed and the divorce was submitted in chief, and indeed within a very few moments after that had occurred, the respondent learned that his client and her witness in the divorce case were both resident of Ohio rather than of Kentucky, and had both perjured themselves at the divorce hearing in a fraudulent attempt to confer jurisdiction, which was in fact entirely wanting, upon the Kenton Circuit Court. Though he admittedly then knew those facts (regardless of whether he knew them earlier or not), it is undisputed that all the parties concerned agreed (as respondent says, upon his own suggestion) that the best thing to do was to get Mrs. Gindy out of the jurisdiction of the Kentucky court.

"That was on Saturday. On the following Monday morning (or, as Judge Goodenough remembers it, about a week following the hearing) the respondent went to see Judge Goodenough about the Gindy divorce case. It might be supposed that the respondent, when he admittedly learned, finally, of the fraud which his client had attempted to practice upon the court, would at once have had his name stricken from the record as attorney for the plaintiff, and made a full disclosure to the court. The respondent himself admits, however, that he did no such thing, but that on the contrary he aided and abetted his client's effort to perpetrate a fraud upon the court, not only by having her depart, post haste, beyond the jurisdiction, but also by concealing the true facts, after he admittedly knew them, from the court. On this point the respondent himself testifies thus:

"'On Monday morning I went to see Judge Goodenough. I referred to this case and he said Mr. Gindy had called up and he wanted to hold up the proceeding for a week or two. When he told me that it would be held over I didn't go any further.

"'Q. You never made that fact known to the Judge? A. No. While the case was under submission but he told me Mr. Gindy has asked to hold it up, thought he could effect a reconciliation.

"'You knew at that time (s)he was not a resident of Kentucky? A. I had her word for it.

" 'Q. You had Radel's word that she was not? A. They stated when they came back that there was something rotten over there, I didn't know but it seems like the idea got across that she didn't live there, that she was just giving that address. I told her that she had better get back to Ohio and stay there.'

"Further, the respondent, speaking of the same matter, says: 'No, I didn't tell Judge Godenough. After I found there might be a reconciliation I did not tell him.

" 'Q. Maybe you should have? A. Mr. Blakely, I do not think there is any doubt that I should. If it hadn't been the idea of a reconciliation, I would have told the Judge before the divorce was granted. He should have been informed. * * *,'

"According to the testimony of Judge Goodenough who was called by the respondent as his witness, the Judge told respondent that the entry of judgment in the divorce case was being delayed in order to give him, the Judge, an opportunity to make an investigation, and not because of any possibility of a reconciliation. But whether or not there was any possibility of a reconciliation, and whether or not Judge Goodenough, the respondent, or anyone else thought that there might be such a possibility, it seems to the Trial Committee that the duty of the respondent, as an ethical member of the profession and as an officer of the court, was clearly the same. The moment he learned the facts, it was his duty to divulge to the court that his client had attempted to confer jurisdiction upon the court by fraud, and that, pursuant to that attempt, she and her witness in the divorce case had perjured themselves. That respondent made no such disclosure to the court, tends to confirm the conclusion of the Trial Committee that the respondent himself was a party to the attempted fraud on the court from its inception. But whether that be so or not, respondent has clearly shown by his own testimony that he became a party to his client's attempted fraud when, admittedly in possession of the facts, he failed to disclose them to the court.

"Thus, it is uncontradicted in this record and is established from respondent's own testimony that after he acquired the knowledge that his client was a resident of Ohio and not of Kentucky, that he did not disclose this fact to the Court, and this, when weighed with the other

evidence presented by the complainant, clearly convinces the Trial Committee that the fair preponderance of the evidence conclusively establishes that the respondent has been guilty of such unethical and unprofessional conduct as to warrant his being disciplines.''

It is ordered that Wm. S. Hargis be permanently disbarred from the practice of law in Kentucky and that his name be stricken from the roster of members of the Kentucky State Bar Association.